PERMA LIFE MUFFLERS, INC., ET AL. *v.* INTER-
NATIONAL PARTS CORP. ET AL.

No. 733.   Argued April 22–23, 1968.—Decided June 10, 1968.

Robert F. Rolnick argued the cause for petitioners. With him on the briefs were *Raymond R. Dickey* and *Bernard Gordon.*

*Glenn W. McGee* argued the cause for respondents. With him on the brief were *John T. Chadwell, David J. Gibbons, John C. Berghoff, Jr., David Silbert,* and *Jay Erens.*

MR. JUSTICE BLACK delivered the opinion of the Court.

The principal question presented is whether the plaintiffs in this private antitrust action were barred from recovery by a doctrine known by the Latin phrase *in pari delicto,* which literally means "of equal fault." The plaintiffs, petitioners here, were all dealers who had operated "Midas Muffler Shops" under sales agreements granted by respondent Midas, Inc. Their complaint charged that Midas had entered into a conspiracy with the other named defendants—its parent corporation International Parts Corp., two other subsidiaries, and six individual defendants who were officers or agents of the corporations—to restrain and substantially lessen competition in violation of § 1 of the Sherman Act [1] and § 3 of the Clayton Act.[2] They also charged that the defendants had violated § 2 (a) of the Clayton Act, as amended by the Robinson-Patman Act,[3] by granting discriminations in prices and services to some of their customers without offering the same advantages to the plaintiffs. The District Court entered summary judgment for respondents with respect to all of petitioners'

[1] 26 Stat. 209, 15 U. S. C. § 1.
[2] 38 Stat. 731, 15 U. S. C. § 14.
[3] 49 Stat. 1526, 15 U. S. C. § 13.

claims. On appeal the Court of Appeals reversed the judgment for respondents on the Robinson-Patman claim but, over Judge Cummings' dissent, affirmed the District Court's ruling that the other claims were barred by the doctrine of *in pari delicto*. The court also held that petitioners' Sherman Act claim was barred because Midas and International, while functioning as separate corporations, had a common ownership and therefore could cooperate without creating an illegal conspiracy.[4] 376 F. 2d 692 (1967). Because these rulings by the Court of Appeals seemed to threaten the effectiveness of the private action as a vital means for enforcing the antitrust policy of the United States, we granted certiorari. 389 U. S. 1034 (1968). For reasons to be stated, we reverse.

The economic arrangements that led to this lawsuit have a long history. Respondent International Parts has been in the business of manufacturing automobile mufflers and other exhaust system parts since 1938. In 1955 the owners of International initiated a detailed plan for promoting the sale of mufflers by extensively advertising the "Midas" trade name and establishing a nationwide chain of dealers who would specialize in selling exhaust system equipment. Each prospective dealer was offered a sales agreement prepared by Midas, Inc., a wholly owned subsidiary of International. The agree-

---

[4] In their motion for summary judgment respondents also argued that the restraints were permissible as reasonable means to protect their registered trade and service marks, but because they had failed to answer interrogatories pertinent to this defense, the district judge ordered it stricken, without prejudice to renewal if respondents promptly answered the relevant interrogatories. Because of its disposition of the case, the Court of Appeals reached neither the merits of this defense nor the question whether respondents had ever properly renewed it. In the circumstances of this case, we think the merits of this defense cannot be decided as a summary judgment question but must be resolved, along with all the other issues, by a trial on the merits.

ment obligated the dealer to purchase all his mufflers from Midas, to honor the Midas guarantee on mufflers sold by any dealer, and to sell the mufflers at resale prices fixed by Midas and at locations specified in the agreement. The dealers were also obligated to purchase all their exhaust system parts from Midas, to carry the complete line of Midas products, and in general to refrain from dealing with any of Midas' competitors. In return Midas promised to underwrite the cost of the muffler guarantee and gave the dealer permission to use the registered trademark "Midas" and the service mark "Midas Muffler Shops." The dealer was also granted the exclusive right to sell "Midas" products within his defined territory. He was not required to pay a franchise fee or to purchase or lease substantial capital equipment from Midas, and the agreement was cancelable by either party on 30 days' notice.

Petitioners' complaint challenged as illegal restraints of trade numerous provisions of the agreements, such as the terms barring them from purchasing from other sources of supply, preventing them from selling outside the designated territory, tying the sale of mufflers to the sale of other products in the Midas line, and requiring them to sell at fixed retail prices. Petitioners alleged that they had often requested Midas to eliminate these restrictions but that Midas had refused and had threatened to terminate their agreements if they failed to comply. Finally they alleged that one of the plaintiffs had had his agreement canceled by Midas for purchasing exhaust parts from a Midas competitor, and that the other plaintiff dealers had themselves canceled their agreements. All the plaintiffs claimed treble damages for the monetary loss they had suffered from having to abide by the restrictive provisions.

The Court of Appeals, agreeing with the District Court, held the suit barred because petitioners were *in pari*

*delicto.* The court noted that each of the petitioners had enthusiastically sought to acquire a Midas franchise with full knowledge of these provisions and had "solemnly subscribed" to the agreement containing the restrictive terms. Petitioners had all made enormous profits as Midas dealers, had eagerly sought to acquire additional franchises, and had voluntarily entered into additional franchise agreements, all while fully aware of the restrictions they now challenge. Under these circumstances, the Court of Appeals concluded, "[i]t would be difficult to visualize a case more appropriate for the application of the *pari delicto* doctrine." 376 F. 2d, at 699.

We find ourselves in complete disagreement with the Court of Appeals. There is nothing in the language of the antitrust acts which indicates that Congress wanted to make the common-law *in pari delicto* doctrine a defense to treble-damage actions, and the facts of this case suggest no basis for applying such a doctrine even if it did exist. Although *in pari delicto* literally means "of equal fault," the doctrine has been applied, correctly or incorrectly, in a wide variety of situations in which a plaintiff seeking damages or equitable relief is himself involved in some of the same sort of wrongdoing. We have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes. It was for this reason that we held in *Kiefer-Stewart Co.* v. *Seagram & Sons,* 340 U. S. 211 (1951), that a plaintiff in an antitrust suit could not be barred from recovery by proof that he had engaged in an unrelated conspiracy to commit some other antitrust violation. Similarly, in *Simpson* v. *Union Oil Co.,* 377 U. S. 13 (1964), we held that a dealer whose consignment agreement was canceled for failure to adhere to a fixed resale price could bring suit under the antitrust laws even though by signing the agreement he had to that ex-

tent become a participant in the illegal, competition-destroying scheme. Both *Simpson* and *Kiefer-Stewart* were premised on a recognition that the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. And permitting the plaintiff to recover a windfall gain does not encourage continued violations by those in his position since they remain fully subject to civil and criminal penalties for their own illegal conduct. *Kiefer-Stewart, supra.*

In light of these considerations, we cannot accept the Court of Appeals' idea that courts have power to undermine the antitrust acts by denying recovery to injured parties merely because they have participated to the extent of utilizing illegal arrangements formulated and carried out by others. Although petitioners may be subject to some criticism for having taken any part in respondents' allegedly illegal scheme and for eagerly seeking more franchises and more profits, their participation was not voluntary in any meaningful sense. They sought the franchises enthusiastically but they did not actively seek each and every clause of the agreement. Rather, many of the clauses were quite clearly detrimental to their interests, and they alleged that they had continually objected to them. Petitioners apparently accepted many of these restraints solely because their acquiescence was necessary to obtain an otherwise attractive business opportunity. The argument that such

conduct by petitioners defeats their right to sue is completely refuted by the following statement from *Simpson:* "The fact that a retailer can refuse to deal does not give the supplier immunity if the arrangement is one of those schemes condemned by the anti-trust laws." 377 U. S., at 16. Moreover, even if petitioners actually favored and supported some of the other restrictions, they cannot be blamed for seeking to minimize the disadvantages of the agreement once they had been forced to accept its more onerous terms as a condition of doing business. The possible beneficial byproducts of a restriction from a plaintiff's point of view can of course be taken into consideration in computing damages, but once it is shown that the plaintiff did not aggressively support and further the monopolistic scheme as a necessary part and parcel of it, his understandable attempts to make the best of a bad situation should not be a ground for completely denying him the right to recover which the antitrust acts give him. We therefore hold that the doctrine of *in pari delicto,* with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action.

Respondents, however, seek to support the judgment below on a considerably narrower ground. They picture petitioners as actively supporting the entire restrictive program as such, participating in its formulation and encouraging its continuation. We need not decide, however, whether such truly complete involvement and participation in a monopolistic scheme could ever be a basis, wholly apart from the idea of *in pari delicto,* for barring a plaintiff's cause of action, for in the present case the factual picture respondents attempt to paint is utterly refuted by the record. One of the restrictions which petitioners most strenuously challenge is the requirement that dealers purchase their supplies exclusively from Midas. Another is the requirement that dealers carry Midas' full line of parts. Neither of these provisions could be in a dealer's self-interest since they obligate

him to buy from Midas regardless of whether more favorable prices can be obtained from other sources of supply and regardless of whether he needs certain parts at all.[5] In addition, the depositions refer to numerous instances in which petitioners asked Midas for permission to purchase from some other source of supply. The record shows that these requests were repeatedly refused by Midas representatives, who underscored the refusals by describing the very requests as "heresy" and by commenting that dealers who bought from outside sources of supply were "asking for trouble" or "were going to be punished." A Midas official warned petitioner Pierce, who had been buying some exhaust parts from other manufacturers, "Joe, this is just like cheating on your wife; it is grounds for divorce."

These statements completely refute respondents' argument that petitioners were active participants and show, to the contrary, that the illegal scheme was thrust upon them by Midas.

There remains for consideration only the Court of Appeals' alternative holding that the Sherman Act claim should be dismissed because respondents were all part of a single business entity and were therefore entitled to cooperate without creating an illegal conspiracy. But since respondents Midas and International availed themselves of the privilege of doing business through separate corporations, the fact of common ownership could not

---

[5] Respondents suggest that these requirements were beneficial to a dealer because they helped him win customers who had confidence in the "Midas" brand, and some dealers evidently did try to reap some benefit from these requirements by advertising, "You get only nationally-advertised Midas products." It seems highly unlikely, however, that benefits of this kind could do more than mitigate very slightly the losses that a dealer would suffer when forced to buy higher-priced Midas products, particularly since dealers would have bought the higher-priced Midas products voluntarily if they thought customer preferences for the brand would be sufficiently strong to offset the higher price.

save them from any of the obligations that the law imposes on separate entities. See *Timken Co.* v. *United States,* 341 U. S. 593, 598 (1951); *United States* v. *Yellow Cab Co.,* 332 U. S. 218, 227 (1947). In any event each petitioner can clearly charge a combination between Midas and himself, as of the day he unwillingly complied with the restrictive franchise agreements, *Albrecht* v. *Herald Co.,* 390 U. S. 145, 150, n. 6 (1968); *Simpson* v. *Union Oil Co., supra,* or between Midas and other franchise dealers, whose acquiescence in Midas' firmly enforced restraints was induced by "the communicated danger of termination," *United States* v. *Arnold, Schwinn & Co.,* 388 U. S. 365, 372 (1967); *United States* v. *Parke, Davis & Co.,* 362 U. S. 29 (1960). Although respondents object that these particular theories of conspiracy now pressed by petitioners were not alleged with sufficient specificity in their complaint, this suggestion is completely without merit. Our modern rules provide for trying cases to serve the ends of justice and require that pleadings "be so construed as to do substantial justice." Rule 8 (f), Fed. Rules Civ. Proc. The gist of petitioners' cause of action has been clear from the outset, and respondents will in no way be prejudiced if petitioners are permitted to rely on these alternative theories of conspiracy.

It follows that the judgment of the Court of Appeals must be reversed. The case is remanded to that court with directions to reverse in full the judgment of the District Court and to remand the case for trial.

*It is so ordered.*

Mr. Justice White, concurring.

I join the opinion and judgment of the Court with the following observations.

As long ago as 1927, in *Eastman Kodak Co. of N. Y.* v. *Southern Photo Materials Co.,* 273 U. S. 359, the Court

recognized that participation in an unlawful course of conduct would not bar recovery where the defendant's superior bargaining power led to plaintiff's participation in the unlawful arrangement. In *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.*, 340 U. S. 211 (1951), where plaintiff was said to have participated in an illegal scheme other than the one charged in his complaint, the Court made it clear that a plaintiff's own delinquency under the antitrust laws would not always bar his treble-damage suit. See also *Bales* v. *Kansas City Star Co.*, 336 F. 2d 439, 444 (C. A. 8th Cir. 1964); *Jewel Tea Co.* v. *Local Unions*, 274 F. 2d 217, 223 (C. A. 7th Cir.), cert. denied, 362 U. S. 936 (1960). These cases are enough to warrant reversal in this case, once it is concluded that the illegal arrangement in which petitioners participated was thrust on them by respondents. This is the conclusion reached by the Court and I agree with it.

I also agree that the *in pari delicto* defense in its historic formulation is not a useful concept for sorting out those situations in which the plaintiff might be barred because of his own conduct from those in which he may have been a party to an illegal venture but is still entitled to damages from other participants. Judgments like these would be better made by hewing closer to the aims and purposes of § 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, which gives treble-damage recovery to the private plaintiff injured by conduct which violates the antitrust laws.

Under § 4, plaintiff must show not only that the defendant violated the antitrust laws but that his conduct caused the damages alleged in the complaint. Normally, it would be enough with respect to causation if the defendant "materially contributed" to plaintiff's injury, *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U. S. 690, 702 (1962); or "substantially

contributed, notwithstanding other factors contributed also," *Momand* v. *Universal Film Exchanges, Inc.*, 172 F. 2d 37, 43 (C. A. 1st Cir. 1948), cert. denied, 336 U. S. 967 (1949). The plaintiff need not show that the illegality was a more substantial cause than any other. *Haverhill Gazette Co.* v. *Union Leader Corp.*, 333 F. 2d 798, 805–806 (C. A. 1st Cir.), cert. denied, 379 U. S. 931 (1964).

Under this rule, a third party proving an illegal undertaking between two defendants may recover for all damages caused by the combination. Those damages normally may be had from either or both defendants without regard to their relative responsibility for originating the combination or their different roles in effectuating its ends. This is because neither defendant, if he acted alone, could be charged with the violation; some degree of participation by both is essential to create a combination within the reach of § 1 of the Sherman Act. Either defendant is therefore deemed to have been a material cause of the damages, sufficient to permit a third party to recover.

This may be the result required under § 4 when conspirators are sued by an injured outsider. But what is the situation when one party to the combination sues the other? Assume three situations: first, A, a manufacturer, sells to B, a retailer. A, over B's objection, insists on B's adhering to specified resale prices. B agrees since A's product is an important part of his business and he can get it nowhere else. B suffers a decline in business because of an inability to match or better the price for competing products. B sues A. He is obviously in a position to prove that A was a substantial cause of his injury.

Second, suppose that when B maintains the suggested prices on A's product, he simply sells more of C's competing product, which he also handles. B is not hurt, but A is. A sues B.

Third, suppose that D and E, competitors, combine to fix higher prices. D's best customer sets up his own source of supply to D's great damage. D sues E, claiming that E was a substantial cause of his injury.

It is arguable that in each supposed situation recovery should be denied because the plaintiff was a party to the illegality and wrongdoers should be left where they are found. In terms of the deterrent aims of the statute permitting injured plaintiffs to recover treble damages, however, this undiscriminating approach makes little sense. When those with market power and leverage persuade, coerce, or influence others to cooperate in an illegal combination to their damage, allowing recovery to the latter is wholly consistent with the purpose of § 4, since it will deter those most likely to be responsible for organizing forbidden schemes. The principles of *Eastman Kodak Co. of N. Y.* v. *Southern Photo Materials Co.*, *supra*, clearly permit recovery by the less responsible, but injured, party. In the first hypothetical case, therefore, B should recover from A in order to deter A and others like him from imposing resale price maintenance schemes on their customers.

In the second case, where manufacturer A, contrary to his expectations, was injured and retailer B was not, there is no reason, based on the deterrent purposes of § 4, to permit recovery from B, even though his cooperation was essential to the combination and even though had a third party been injured he could have recovered from either A or B, or from both. A, the moving force, should not be rewarded for his efforts to further an unlawful price arrangement and in effect to take from B the profits, trebled, that B made by selling the products of A's competitor. B was unwilling to enter the illegal scheme, was motivated principally by what he thought was economic necessity—the need to avoid losing business by being unable to offer a major

product line—and would have been only marginally deterred by the prospect of antitrust liability.

In the third case, where D and E are competitors, if D simply proves the agreement and the resulting loss, should he recover from E, absent some believable showing that E was the more responsible for the illegal scheme? No doubt E was a substantial factor in the combination and hence in the injury; a judgment for damages might deter him and others from violating the law. But D is equally responsible for his own damages. To permit him a recovery may be a counter-deterrent. By assuring him illegal profits if the agreement in restraint of trade succeeds, and treble damages if it fails, it may encourage what the Act was designed to prevent. In this situation, it is doubtful that the ends of § 4 would be measurably served by permitting D's recovery. If judge or jury finds the parties equally responsible for the conduct which caused injury, D's recovery under § 4 should be denied for failure of proof that E was the more substantial cause of the injury.

No simple formula can encompass the infinite variety of possible situations. Generally speaking, however, I would deny recovery where plaintiff and defendant bear substantially equal responsibility for injury resulting to one of them but permit recovery in favor of the one less responsible where one is more responsible than the other. This rule would simply pose the issue of causation in particularized form. There will be little mystery as to what evidence would be relevant proof: facts as to the relative responsibility for originating, negotiating, and implementing the scheme; evidence as to who might reasonably have been expected to benefit from the provision or conduct making the scheme illegal under § 1; proof of whether one party attempted to terminate the arrangement and encountered resistance or counter-measures from the other; facts showing

who ultimately profited or suffered from the arrangement.

As I view the record in the case before us, the evidence is insufficient to show that petitioners were as responsible as respondents, or more so, for the admittedly illegal scheme. The evidence before us does not suggest that petitioners were equal partners with respondents with respect to the origin and implementation of this scheme for distributing respondents' mufflers, or in terms of benefits from the scheme. In such circumstances summary judgment for respondents was improper.

Mr. Justice Fortas, concurring in the result.

I agree with the result in this case. Petitioners' right to recover in their own interest and as "private attorneys general" to enforce the antitrust laws cannot be denied on the basis of the doctrine of *in pari delicto*. *Simpson* v. *Union Oil Co.*, 377 U. S. 13 (1964).

The doctrine has, however, a significant if limited role in private antitrust law. If the fault of the parties is reasonably within the same scale—if the *"delictum"* is approximately *"par"*—then the doctrine should bar recovery. This might be the case, for example, if a manufacturer of mufflers and a manufacturer of other parts had combined to formulate and operate a collusive scheme. One co-adventurer could not sue the other for discriminatory or restrictive practices which allegedly diminished its take from the enterprise.

But equality of position of this general nature is necessary before *in pari delicto* may apply to bar an antitrust remedy. Unless the doctrine is so limited, the private remedy provided by the antitrust laws is nullified to a significant extent. The owner of a gas station may enter into an arrangement with the distributor and may benefit from its restrictive provisions. But this less-than-equal participation in the crime must not bar him

from recovering in his own and the public interest if he can show that he has suffered compensable harm. Our decision in *Simpson* indicates this quite clearly. The antitrust laws are intended to protect individuals "from combinations fashioned by others and offered to [them] . . . as the only feasible method by which [they] may do business." *Ring* v. *Spina,* 148 F. 2d 647, 653 (1945).

As the Court points out, it is possible that the franchisee may be proved to be a collaborator, or co-adventurer, or a true *particeps criminis* with respect *to a particular aspect* of the plan—for example, if he *originated and insisted* upon the inclusion of a territorial exclusivity clause which was not in the franchise as drafted by the franchisor. He could not recover damages based upon this, if, essentially, it is his own act.

Clearly, petitioners here are not co-adventurers or partners in the franchise arrangement as a whole, and they are not barred by *in pari delicto.* On remand, as the Court orders, if petitioners are chargeable with responsibility for a particular clause of the agreement or restrictive covenant because it is, in substance, their own act, they should not be allowed to recover for injury they may have suffered because of it.

Mr. Justice Marshall, concurring in the result.

While I agree with the result and much of the reasoning in the opinion of the Court in this case, I find myself unable to accept what I take to be the holding that the doctrine of *in pari delicto* has no place in a treble-damage antitrust action. Not only is it unnecessary to pass on such a broad proposition on the facts of this case, as the Court's opinion reveals, but the holding itself is, in my opinion, incorrect.

I agree that the "complex scope, contents, and effects" of the doctrine as it has grown up in the common law should not be applied mechanically to private antitrust

actions under the relevant federal statutes. On the other hand, I believe that a limited application of the basic principle behind the doctrine of *in pari delicto* is both proper and desirable in the antitrust field. As the Court notes, *ante,* at 138, the literal meaning of *in pari delicto* is of equal fault. I would hold that where a defendant in a private antitrust suit can show that the plaintiff actively participated in the formation and implementation of an illegal scheme, and is substantially equally at fault, the plaintiff should be barred from imposing liability on the defendant.

Such an approach would still require reversal of the decision of the Court of Appeals in this case. As this Court's opinion makes perfectly clear, the mere fact that a party enters into an agreement containing provisions that are violative of the antitrust laws with the intent to make money by operating under the agreement is not in itself sufficient to show that he is equally responsible for the existence of the illegal provisions. *Simpson* v. *Union Oil Co.,* 377 U. S. 13 (1964). Furthermore, the Court is certainly correct in concluding that the record is replete with evidence, relating to the tying and exclusive-dealing provisions of the franchise agreement, which indicates, with sufficient probative force to withstand respondents' motion for summary judgment, that the petitioners did not actively seek out or support all the anticompetitive restraints embodied in the franchise.

However, the inquiry should not stop here. The franchise agreement also contains provisions requiring both resale price maintenance and the observance of territorial restrictions on sales by franchisees. Both of these sets of restrictions are ones which, at least on their face, would ordinarily be expected to benefit the franchisees more than Midas. Both restrict competition between franchisees, not between Midas and other suppliers competing to sell parts to Midas franchisees. If Midas can

make an adequate showing that those provisions were inserted into the franchise agreement at the behest and for the benefit of petitioners and their fellow franchisees, petitioners should, in my opinion, be barred from contending that they were damaged by the existence and enforcement of the provisions.

I agree with the Court that petitioners should not be barred from recovering damages attributable to the enforcement of the tying and exclusive dealing provisions against them on the sole ground that they participated in the formulation of other anticompetitive provisions in the agreement. Cf. *Moore* v. *Mead Service Co.*, 340 U. S. 944 (1951), vacating 184 F. 2d 338 (C. A. 10th Cir. 1950). However, if Midas could show, which it has quite clearly not done at this stage of the litigation, that petitioners actually participated in the formulation of the entire agreement, trading off anticompetitive restraints on their own freedom of action (such as the tying and exclusive dealing provisions) for anticompetitive restraints intended for their benefit (such as resale price maintenance or exclusive territories), petitioners should be barred from seeking damages as to the agreement as a whole.

It may be argued that the course I propose unduly complicates private antitrust litigation. A holding that a party who voluntarily enters into an agreement containing provisions that violate the antitrust laws is barred from any recovery on that agreement altogether (as the Court of Appeals has held here) or, at the other extreme, is absolutely free to recover any damages that he can show to stem from his operations under the agreement (as this Court's opinion seems to hold) would presumably be considerably easier to apply in most cases. It seems to me, however, that neither holding would represent a satisfactory resolution of the difficult problems concerning the administration of the antitrust laws raised by

agreements such as the one involved in the present case.

The reasons for rejecting the approach taken by the Court of Appeals are, as I have said, persuasively set forth in the opinion of the Court. The reasons I see for rejecting the approach taken by this Court are, perhaps, less related to the public interest in eliminating all forms of anticompetitive business conduct and more related to the equities as between the parties. The principle that a wrongdoer shall not be permitted to profit through his own wrongdoing is fundamental in our jurisprudence. The traditional doctrine of *in pari delicto* is itself firmly based on this principle. I nevertheless agree, because of the strong public interest in eliminating restraints on competition, that many of the refinements of moral worth demanded of plaintiffs by such traditional legal and equitable doctrines as *volenti non fit injuria,* unclean hands, and many of the variations of *in pari delicto* should not be applicable in the antitrust field. However, I cannot agree that the public interest requires that a plaintiff who has actively sought to bring about illegal restraints on competition for his own benefit be permitted to demand redress—in the form of treble damages—from a partner who is no more responsible for the existence of the illegality than the plaintiff.

The possible added deterrence to violations of the antitrust laws that would be produced by the Court's holding may well be equaled, if not surpassed, by the new incentive it will create to commit such violations, for a potential violator will have less to lose if he can attempt to recover his losses from his partner should the scheme not work out to his benefit.

The Court's opinion appears to seek to minimize the consequences of doing away with the *in pari delicto* defense by suggesting that a defendant will be able to have the "beneficial byproducts of a restriction" (*ante,* at 140) to the plaintiff taken into account in the compu-

tation of damages. This, of course, is to some extent already true in any antitrust case. Illegal conduct does not *per se* result in a money judgment for a plaintiff; injury must always be shown. However, a defendant might also be permitted to show that the plaintiff's financial rewards from some of the illegal provisions of an agreement outweighed the harm suffered from other illegal provisions, and accordingly on some sort of offset theory the plaintiff would recover nothing.

If such an offset approach on the issue of damages is envisioned by the Court, it hardly seems an adequate means of preventing unjust enrichment. First, that approach clearly permits damages to be awarded when injury is shown to outweigh benefit regardless of the nature of the plaintiff's participation in the scheme. Second, it adds an unnecessarily speculative element to the factual inquiry required in an antitrust case. While a trier of fact may have some difficulty in allocating responsibility between the parties to an agreement, the allocation can be made for the most part on the basis of hard evidence as to the facts surrounding the making of the agreement. The determination of damages in an antitrust suit, however, almost invariably requires a certain amount of speculation, no matter how informed. Cf. *Bigelow* v. *RKO Pictures, Inc.,* 327 U. S. 251, 264–266 (1946). Such speculation is ordinarily unavoidable if damages are to be provable. Here there is no necessity for permitting additional speculation as to offsetting benefits in order to prevent unjust enrichment because the same goal can be achieved by a factual evaluation of the parties' respective fault.

For example, it is obviously much easier to determine in this case whether petitioners actively participated in the formulation and implementation of the various illegal provisions of the franchise agreement than it is to decide whether the monetary benefits that petitioners obtained

through the resale price maintenance and exclusive territorial provisions surpassed the losses they suffered from the exclusive dealing and tying arrangements. Since I regard a respective-fault approach as superior to a damage-offset approach on principle, the complications inherent in the latter inquiry merely reinforce my conviction that the Court is being unwise in broadly rejecting the doctrine of *in pari delicto*.

MR. JUSTICE HARLAN, with whom MR. JUSTICE STEWART joins, concurring in part and dissenting in part.

The variety of views this case has engendered seems to me to stem from lack of agreement on a definition of the term *"in pari delicto,"* as well as a disagreement, perhaps, on the standards that should govern the use of the defense to which that term is properly applied. I believe that the courts below misused the term, but that properly used it refers to a defense that should be permitted in antitrust cases. Consequently, I would remand this case not for immediate trial but for fresh consideration of the motion for summary judgment upon proper standards.

Plaintiffs who are truly *in pari delicto* are those who have themselves violated the law in cooperation with the defendant.[1] If the law is the Sherman Act, both are, in principle, liable equally to criminal prosecution. For example, two manufacturers who agree on a price at which they will sell are "of equal fault," as are a manufacturer and a dealer who strike a bargain whereby each accepts an illegal restriction that benefits the other.

---

[1] This is at least the traditional use of the term. See, *e. g., Williams* v. *Hedley,* 8 East 378, 381–382, 103 Eng. Rep. 388, 389. See generally Note, In Pari Delicto and Consent as Defenses in Private Antitrust Suits, 78 Harv. L. Rev. 1241, distinguishing the two defenses. The present case is as good an illustration as any of the usefulness of maintaining distinct terms for the distinct situations properly characterized by *"in pari delicto,"* "consent," "unclean hands," and so forth.

When a person suffers losses as a result of activities the law forbade *him* to engage in, I see no reason why the law should award him treble damages from his fellow offenders. It seems to me a bizarre way to "further the overriding public policy in favor of competition," *ante,* at 139, to pay violators three times their losses in doing what public policy seeks to deter them from doing. Even if the threat of intra-conspiracy treble damages had some deterrent effect, however, I should not think it a too "fastidious regard for the relative moral worth of the parties," *ibid.,* to decline to sanction a kind of antitrust enforcement that rests upon a principle of well-compensated dishonor among thieves.

There are, however, three situations quite distinct from that to which I think the term *in pari delicto* is properly applied. The first is the "consent" situation in which the Latin maxim *"volenti non fit injuria"* is sometimes invoked. Where X and Y conspire to fix prices at which they will sell, they are *in pari delicto.* If Z, *knowing of the conspiracy,* nevertheless purchases from X, he is not *in pari delicto.* He has committed no offense: the most that can be said is that he knowingly allowed an offense to be committed against him. I would agree, for many of the reasons stated in the opinions of MR. JUSTICE BLACK, MR. JUSTICE FORTAS, and MR. JUSTICE MARSHALL, that there should be no defense in such a situation, where the plaintiff has done nothing the law told him not to do.

A second situation distinguishable from true *in pari delicto* is illustrated by *Kiefer-Stewart Co.* v. *Seagram & Sons,* 340 U. S. 211, relied on by the Court. It was there alleged in defense to a treble-damage action that the defendants' illegal actions were taken in reprisal against altogether independent illegal actions by the plaintiff. Here again, I accept the decision that this is no defense. Our law frowns on vigilante justice. Since the plaintiff is in part enforcing the public interest against the defendants' violations, I would permit him to do so, and

leave punishment for any independent violation by him to proper means of enforcement.

The third distinguishable situation may or may not be illustrated by *Simpson* v. *Union Oil Co.*, 377 U. S. 13, and *Albrecht* v. *Herald Co.*, 390 U. S. 145, two cases that I find it quite difficult to understand.[2] In each of them, the plaintiff had been offered a dealership, on terms that he did not participate in formulating, and in each case he at first "accepted" such a dealership. Since neither case stated satisfactorily where the alleged combination in restraint of trade was to be found, it is not clear whether the plaintiff's acceptance of a dealership was itself a forbidden act. If it was not, then these cases fall under the heading of "consent" cases. A person who engaged in a lawful business on the terms offered should not be prevented from suing merely by his knowledge that others violated the law in contriving those terms. If, however, those plaintiffs were doing something the law told them not to do, I suggest that recovery in those cases can best be understood on the theory of a "coercion" exception to the *in pari delicto* doctrine. That is, although a large business with the power to dictate terms and a small business that can only accept them or cease doing business may both, in principle, be liable to legal sanctions for the contract that results from the offer and acceptance, it is considered that the liability is not *"par,"* and that the business accepting dictation is only minimally blameworthy.

In my view, the District Court and the Court of Appeals did not apply the true *in pari delicto* standard to this case. The District Court said that "each plaintiff voluntarily entered into the franchise agreement . . . and accepted the benefits therefrom. They are . . . [therefore?] *in pari delicto* with defendants . . . ."[3] At an-

---

[2] See my dissenting opinion in *Albrecht*, 390 U. S., at 156.

[3] 1966 Trade Cases ¶ 71,801, at 82,705.

other point the court said, "We have repeatedly held that a person who freely assents to an act suffers 'no legal injury' if harm results therefrom." [4] Although the District Court made a passing distinction of the "coercion" and "unclean hands" doctrines, it is not clear that it meant to hold that the violation of the Sherman Act, if any, was one for which plaintiffs were subject to public-law sanctions along with the defendants.

The Court of Appeals decision was similar. That court relied on the District Court's language quoted above, adding that each of the plaintiffs had made a substantial profit from selling auto parts, a fact that might bear on the measure of any damages but which, apart from illegal action on the part of the plaintiffs, should not afford an absolute defense.[5]

It is by no means clear on this record, however, that the plaintiffs may not be said to have been *in pari delicto* in the proper sense of that term. This question is rendered more difficult by the complexity of the record history of plaintiffs' activities, and by the formidable obscurity of the law of dealer liability for vertical restraints, an obscurity fostered by *Simpson, supra, Albrecht, supra,* and above all by *United States* v. *Parke, Davis & Co.,* 362 U. S. 29. Although I make no attempt to drain the bog at this point, I am of the view that before this case goes to trial the lower courts should be given another opportunity to consider the *in pari delicto* defense. I would remand this case to determine whether any agreement alleged to be in restraint of trade was one for which the plaintiffs were substantially as much responsible, and as much legally liable, as the defendants. I would permit the lower courts to consider this question upon the existing affidavits and such additional material as either side may wish to adduce.

---

[4] *Id.,* at 82,706.

[5] See 376 F. 2d 692, at 693, 695.