United States Court of Appeals,

Eleventh Circuit.

No. 94-4985.

BANCO INDUSTRIAL DE VENEZUELA, C.A., a Venezuelan Banking Institution, Plaintiff-Appellant,

v.

CREDIT SUISSE, a Swiss Banking Institution, Maria Isabel Doyle, an Individual, Defendants-Appellees.

Nov. 20, 1996.

Appeal from the United States District Court for the Southern District of Florida. (No. 90-1470-CIV-KMM), K. Michael Moore, Judge.

Before HATCHETT, Chief Judge, ANDERSON, Circuit Judge, and WOOD[*], Senior Circuit Judge.

WOOD, Senior Circuit Judge:

This civil case based on diversity and federal question jurisdiction involves extensive fraud in international banking.

A brief factual summary is necessary. Plaintiff-appellant, Banco Industrial de Venezuela C.A. (BIV), referred to as a development bank, was established and is owned by the government of Venezuela. In 1983, during difficult economic times, Venezuela instituted a program designed to encourage the import of certain categories of essential goods not produced in Venezuela, such as farm machinery and medicines. This was done by instituting a preferential currency exchange rate for U.S. Dollars administered by the government. The program was called RECADI. [1] Under the

---

[*]Honorable Harlington Wood, Jr., Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

[1]Venezuela also developed another currency program which was intended to discourage nonessential imports and encourage exports. This program was seen as increasing Venezuela's foreign

program, letters of credit were issued by BIV to facilitate the RECADI imports.

Before long, those with sophisticated criminal intentions saw substantial personal possibilities in the government's RECADI program. Instrumental in the abuse of this program was a man named Felix Miralles. Miralles was executive vice president of BIV, and the person solely in control of the bank's letter of credit department involved in the RECADI program. Miralles reported to no higher authority about letters of credit, and on other matters he reported only to the bank's president. The dubious distinction, however, for devising this particular financial conspiracy goes to a person named Jose Mederos, aided by a man named Machado, both non-bank employees. They quickly got the helpful attention of Miralles by paying him bribes exceeding $400,000. The conspiracy was simple in concept. Miralles would approve the payment of BIV letters of credit for nonexistent RECADI imports that were shown to exist by false documents. BIV would then be reimbursed by the government. The letters of credit and the documents were patently false and inadequate. During the trial they were at times described in nonlegal terms as "chimbo" (phonetic), translated to mean "Mickey Mouse." In time, the Venezuelan government recognized the inadequacy and refused to reimburse BIV. Nevertheless, the fraud worked for a while and finally collapsed in a national scandal in 1987. BIV lost in excess of $1,618,000. However, for several years during the operation of the fraud it was not a losing

_____

currency reserves and strengthening the Venezuelan economy. That program is not involved in this case.

proposition for BIV, as the bank collected its usual transaction fees for issuing the fraudulent letters of credit.

The situation gets more complicated with the entrance of defendant Maria Doyle. She formerly had been a Panamanian lawyer, but at this time was employed as an assistant treasurer in the Miami branch of defendant Credit Suisse (CS), a Swiss banking institution. Venezuela was part of her area of banking responsibilities. Doyle met Mederos in 1985 when Mederos opened a personal banking account with CS/Miami, in addition to several separate corporate accounts, using BIV as a reference. Mederos deposited substantial sums in his accounts at CS/Miami. The corporate accounts apparently were useful to Mederos in his bogus shipping transactions. When Mederos desired to form some Panamanian corporations, Doyle referred him to her former law firm in Panama. Later in 1987, Doyle learned from the CS branch in Venezuela that Mederos was having "problems" there. On inquiry Mederos admitted he had been accused of fraud, but explained it away as merely "political." Doyle reported the problem at a bank meeting. At the bank's direction Doyle told Mederos to take the bulk of his banking business elsewhere based on the rumors of trouble. CS also directed Doyle to monitor the Mederos' accounts which remained with CS/Miami. She then referred Mederos to the Banque Intercommerciale de Gertion (BIG), warning BIG about the rumors of fraud.

The legal activity began when BIV discovered the fraud and tried to recoup its letter of credit losses in Florida state court. BIV secured a temporary injunction against transfers from the

accounts of Mederos, and sent writs of garnishment to fifty Miami banks. It also sought Mederos' bank records from CS. Mederos had withdrawn $501,000 from his CS account with checks prepared by Doyle payable to BIG, and deposited that same amount with BIG. BIG promptly opened an account in its own name in CS, but it was really Mederos' account and funded with his money. CS did not inform BIV of Mederos' interest in that account. Doyle claimed not to know it was the same money. That money barely escaped being garnished when BIG directed that this account, with the Mederos' funds, be sent to CS in Switzerland.[2]

BIV then expanded its legal efforts and filed this nine-count complaint against CS and Doyle for their alleged roles in the conspiracy, theft and laundering of over $1.6 million, which represented BIV's letter of credit losses. Several RICO counts were included. The defendants, in addition to denying plaintiff's allegations, raised affirmative equitable defenses.

An eight-week trial followed in 1994 before a twelve-person jury. Doyle claimed her Fifth Amendment privilege on some issues. Each side had evidence to support its allegations. The jury returned a verdict based on its answers to fifteen questions covering plaintiff's allegations and defendant's equitable defenses. On the legal issues the jury found in favor of defendants. On the equitable defenses of estoppel and *in pari delicto* the jury returned advisory findings likewise favorable to the defendants. The jury, as instructed, did not initially

---

[2]CS informs us in its brief that that money with interest exceeding $430,000 is now frozen and held for BIV.

consider damages in the questions following the equitable defense questions. The jury found plaintiff was precluded from recovering from defendants due to the equitable defenses of estoppel and *in pari delicto.* After receiving the verdict, the trial judge, in an abundance of caution, asked the jury to consider, among other things, whether it would be appropriate to award BIV any compensatory or punitive damages. The jury then found no compensatory damages due BIV from either defendant, but allowed $25,100 in punitive damages against Doyle. That punitive damage award was set aside and is not involved as a separate issue in this appeal.

BIV raises two main issues, both of which concern only the equitable defenses, *in pari delicto* and estoppel. First, BIV argues that the defendants should not have been permitted to assert their equitable defenses in plaintiff's action at law, although plaintiff concedes the applicable law is unsettled. Secondly, BIV claims that it was error in any event for the jury to hear the equitable defense evidence against BIV at the same time as it heard the evidence on BIV's allegations against CS and Doyle, because of the likelihood of confusing and inflaming the jury. Related evidentiary and instruction matters are also raised.

Issues of law will be reviewed de novo, but the use of an advisory jury by the district court is reviewed under an abuse of discretion standard. Fed.R.Civ.Pro. 39(c).

*DISCUSSION*

I.

The district judge, in his discretion, adopted the advisory

findings of the jury on equitable defenses, rendering those facts subject to the clearly erroneous standard. BIV attacks the jury's verdict in favor of the defendants by arguing the culpability of both defendants. Doyle's conduct, from the evidence, was questionable. She was, as part of her banking responsibilities, of assistance to Mederos when he brought the funds to be banked in Miami. By that time, Mederos already had possession of money from the fraud in Venezuela. Doyle advised CS/Miami that she had heard Mederos was having some trouble in Venezuela. If Doyle's former firm in Panama subsequently helped Mederos establish new Panamanian corporations to further his scheme, Doyle is not shown to be responsible for that firm's actions. There is also some evidence of CS involvement in the fraud when it assisted Mederos in his banking business at the same time as BIV was attempting to locate his funds. The defendants, however, did not invent the fraud or have anything directly to do with BIV's vice president or other culpable bank employees. We cannot reweigh the evidence and credibility and reach our own factual conclusions about culpability. The fact finders, as instructed by the court, did that under the preponderance of evidence standard or by the clear and convincing evidence standard as applicable to stolen property counts. In all instances, the jury found contrary to BIV except on the punitive damage issue against Doyle. But the small punitive damage award against Doyle and the finding of no damages against CS (which could obviously have paid substantial damages) further shows that the jury viewed the defendant's culpability as limited. We cannot say the jury's verdict is not sufficiently supported.

## II.

BIV also argues that the affirmative defenses should not have been allowed in BIV's action at law because to consider them was contrary to the public interest. Public consequences are an integral factor in the equitable exercise of discretion, as BIV points out, citing *Weinberger v. Romero-Parcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). That case involved an injunction sought under a federal statute. The Supreme Court's comment about the importance of public consequences was made in connection with "employing the extraordinary remedy of injunction," 456 U.S. at 312, 102 S.Ct. at 1803, not the use of the less drastic equitable defenses of *in pari delicto* and estoppel. BIV also calls our attention to *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). In *Pinter,* an oil and gas securities case, the Court refers to the *in pari delicto* defense and mentions in footnote 12, 486 U.S. at 635, that the defense has rarely succeeded. However, the Court succinctly states the test: "[U]nless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater, the *in pari delicto* defense should not be allowed, and the plaintiff should be compensated", 486 U.S. at 636, 108 S.Ct. at 2073. The jury in the present case, in which the bank is the plaintiff, however, advised that BIV's fault was at least equal to or greater than the defendants. That finding was accepted by the trial judge after a long trial. We cannot say based on an examination of the record that the jury's advisory finding of responsibility or culpability was clearly erroneous.

In *Johnson v. Yellow Cab Co.,* 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814 (1944), likewise cited by plaintiff, it is explained that the clean hands doctrine is not such a rigid formula as would eliminate "the free and just exercise of discretion," but depends on the particular transaction. 321 U.S. at 387-88, 64 S.Ct. at 625. That is the way the district judge approached this present case. He examined the transactions, and by the exercise of discretion, with the jury's assistance, the judge reached a result contrary to BIV.

In response to the findings of the judge and jury that it was as or more culpable than defendants, BIV argues that it took action and fired Vice President Miralles and the other employees who cooperated in the fraud. Those were the persons whose actions primarily constituted the basis for the affirmative defenses of defendants. BIV argues the misconduct of its vice president and its other employees was outside the scope of their employment, and being contrary to the bank's interests, made the bank a victim. Therefore, BIV argues, the fraudulent acts should not have been attributed to it, because that would prevent it from recovering its losses. But this fraud involved the bank's letters of credit, which were the sole responsibility of the executive vice president, the bank's second highest officer.

The case-by-case, particular transaction basis consideration of equitable defenses such as *in pari delicto* can be seen in *Batemen Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215. There the court affirmed the denial of an *in pari delicto* defense in a securities fraud case. The

plaintiff had tried to capitalize on insider corporate information which turned out to be inaccurate, causing plaintiff's losses.  The plaintiff was therefore violating the same laws under which the plaintiff sought recovery.  The *in pari delicto* defense was held not applicable because of the significant benefits of exposing insider trading.  472 U.S. at 315, 105 S.Ct. at 2631.  Precluding the suit would interfere with the enforcement of securities laws designed to protect the public.  Were the situation otherwise, the Court notes, plaintiff's own culpability, if at least substantially equal to defendant's, would bar the suit, because of the *in pari delicto* defense.  472 U.S. at 310, 105 S.Ct. at 2628-29. Similarly, in *Perma Life Mufflers, Inc., et al v. International Parts Corp., et al.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), a divided Court held that the *in pari delicto* ("of equal fault") defense was not applicable to the facts of that case, because applying the defense would interfere with the antitrust policy of the government.  392 U.S. at 138-39, 88 S.Ct. at 1984. In a partial dissent, Justice Harlan, in considering the *in pari delicto* defense, noted the complex record and the obscurity of the law in that area, as we do in the present case.  He commented he would "make no attempt to drain the bog."  312 U.S. at 156, 88 S.Ct. at 1993 (Harlan, J., concurring in part and dissenting in part).  We will follow his example.  In this case, as in *Bateman* and *Perma Life,* the court considered the facts and applied the equitable defenses accordingly, and that is sufficient.

BIV further argues the equitable defenses caused an injustice and the result is contrary to public policy, citing *Schacht v.*

*Brown,* 711 F.2d 1343 (7th Cir.1983), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983). In *Schacht* the Seventh Circuit was considering a different factual context so the decision is of limited usefulness in this case. In *Schacht* when the Illinois Director of Insurance sued a bank and its directors for fraud the court found that prolonging the demise of the bank by fraud was a consequence which could in no way have benefitted the bank, 711 F.2d at 1348, and so the use of an equitable defense would have been an injustice contrary to public policy. By contrast, BIV, though it lost in the end, at least did benefit to some extent during the fraud's life from the collection of its customary transaction fees. Thus, its claim of injustice is not as strong in that regard as in *Schacht.* Likewise in *Quick v. Peoples Bank of Cullman County,* 993 F.2d 793 (11th Cir.1993), another case in which the bank was the defendant, not the plaintiff, this court in part considered the benefit the bank derived from a bank officer's RICO violations and held the bank subject to liability through the application of *respondeat superior.* We need not decide this case, however, solely by extending *Schacht* or *Quick* to the present factual situation.

BIV also argues it would offend public policy for the defendants as wrongdoers to retain their allegedly fraudulent gains. It would, BIV claims, provide a sort of immunity to those defendants who conspire with bank employees. To anoint such affirmative defenses, BIV argues, would constitute an invitation to always include some bank employees in planned fraudulent schemes as a defense against later recoupment by the bank. The bank argues

that the defendants' view of affirmative defenses in effect would grant immunity to others like the defendants in this case. Perhaps, but if so then the bank must increase its own vigilance and supervision to prevent being made a victim by the culpability of its own responsible officers. In this case the principal employee at fault was the executive vice president of BIV, and the bank cannot avoid the consequences for his fraudulent actions within the scope of his unsupervised duties. If otherwise, a bank that is found equally or even more culpable than the defendants, as in the present case, could nevertheless recover for its own culpability. Plaintiff must be responsible for the actions of its executive vice president. Trying to decide this particular case solely upon a public policy basis is futile.

## III.

These equitable issues, as the district judge noted, were briefed and argued at great length and detail prior to and during trial. He did not bifurcate the case into its legal and equitable components, finding the equitable defense evidence would in any event be properly presented to the jury to negate elements of plaintiff's case. It is also difficult to see how plaintiff could have presented its own case understandably to the jury without including the evidence showing how the bank fraud had originated and developed and become connected with defendants. A legitimate question would have arisen as to how this fraud could have operated within the plaintiff bank for so long without being detected. Excluding all the evidence or admitting only selected parts of the whole story (as BIV might prefer for its own purposes) would not

have been sufficient. Telling the whole story was justified. A bifurcated trial would have resulted in the trial judge hearing two substantially similar trials.

The district judge instructed the jury in detail on the two aspects of the case, both legal and equitable, cautioning the jury that it must separately consider each claim and the evidence related to it. The unanimous jury verdict was "no" on all of the interrogatories regarding plaintiff's allegations. Then followed the equitable defense questions. The jury's unanimous answers were "yes" as to whether BIV should be estopped as to both defendants. The answer again was "yes" as to whether BIV bore equal or greater fault for the fraud than the defendants. The jury was further instructed that if the answer to either of the above questions was "yes", as was the case, then BIV was precluded from recovery on any of its claims. If the jury's answer, however, was "no" then there were several additional questions to be answered including a question as to damages. So far as the jury was concerned, the plaintiff simply failed in its proof on all claims. There was no sign of jury confusion. No questions came from the jury to the judge. Unless there was error, as claimed by BIV, because its allegations were somehow tainted by being tried with the equitable offenses, BIV cannot prevail. We find that was not the case.

In the particular circumstances of this case, one full of mutual accusations of wrongdoing, we find no confusion and no affront to public policy where the jury finds that the plaintiff, who seeks recovery, was at least equally or more culpable for the cause of its troubles than the defendants. Even assuming the

defendants were wrongdoers, and there was evidence to that effect, the jury and the judge considered the apportionment of culpability. Equity will leave the parties as they are and not step in to help the equal or major wrongdoer who first caused the problem to recoup its losses.

Miralles, the executive vice president of BIV, was in total control of the letters of credit department, and the letters of credit were the instruments of the fraud. He was no ordinary employee, but the second highest ranking employee of the bank. He was not supervised in regard to letters of credit. He accepted a bribe and grossly violated the trust that had been imposed in him. The fraud was a continuing one, not an isolated act. It was all within the scope of Miralles' banking responsibilities. The letters of credit themselves and the way they were documented appear to have been at least suspicious and inadequate; to borrow an apt term, they were "chimbo." Nevertheless, during the functioning of this fraud within its own walls, BIV received some income in its normal course of business from the letters of credit. If we were to assume the truth of all the allegations, inferences, and innuendos each party has levelled at the other, which we need not do since the fact finders have reasonably sorted it out, we would see no reason for the court to try to apportion the loss on some basis among the wrongdoers themselves. Public policy would not be served by allowing the bank to recoup what it lost because of the very high level of fraud within its own doors.

The trial judge, in ruling on objections and the admission of evidence and his full and clear instructions to the jury, when

viewed as a whole, did as well as any one reasonably could.  As to the equitable matters we find no abuse of discretion.  We find no need to disturb the jury's verdict on plaintiff's allegations nor its advisory judgment on the equitable defenses adopted by the trial judge.  If there was any error in this long, unusual, and complicated case, it was of no consequence.  The other lesser related matters raised by BIV are without merit.  We do not intend with this case to "drain the bog" in the words of Justice Harlan, nor do we intend to deepen it in this area of the law, only to decide this particular case on its own facts.

The plaintiff is not entitled to a new trial, and we AFFIRM the district court in all respects.