PREMIER ELECTRICAL CONSTRUC-
TION COMPANY, Plaintiff-
Appellant,

v.

MILLER–DAVIS COMPANY and St.
Arnaud Electric Company,
Defendants-Appellees.

PREMIER ELECTRICAL CONSTRUC-
TION COMPANY, Plaintiff-
Appellant,

v.

MILLER–DAVIS COMPANY, Defendant-
Appellee.

Nos. 17290, 17312.

United States Court of Appeals,
Seventh Circuit.

March 6, 1970.

Rehearing in No. 17290 En Banc
Denied April 15, 1970.

---

**9.** Johns Hopkins University v. Hutton, 40 F.R.D. 338 (D.Md.1966) (Thomsen, C. J.).

---

A. Denison Weaver, Chicago, Ill., for appellant.

Luther C. McKinney, John C. Berghoff, Jr., Chicago, Ill., for appellee St. Arnaud Electric Co.; Chadwell, Keck, Kayser & Ruggles, Chicago, Ill., of counsel.

Owen Rall, Peter M. Sfikas, Chicago, Ill., for Miller-Davis; Peterson, Lowry, Rall, Barber & Ross, Chicago, Ill., of counsel.

Before SWYGERT, Chief Judge, KERNER, Circuit Judge, and WISE, District Judge.[1]

SWYGERT, Circuit Judge.

These are consolidated appeals in companion cases. No. 17312 is an appeal from judgment in favor of Miller-Davis Company after a bench trial on the merits in a breach of contract action instituted by Premier Electrical Construction Company against Miller-Davis. No. 17290 is an appeal from the dismissal on the pleadings of a treble damage antitrust action instituted by Premier against Miller-Davis and St. Arnaud Electric Company. We affirm the judgment in favor of Miller-Davis on the contract action. We reverse the judgment dismissing Premier's antitrust complaint and remand for trial.

### The Contract Action

The facts relating to the contract action are substantially as follows: In February 1966 the Atomic Energy Commission invited several general contractors, including Miller-Davis, to bid on a project at the Argonne National Laboratories, Argonne, Illinois. The Commission requested a base bid and a bid for nine alternates. The bids were to be opened at 2 p.m., March 3, 1966. The electrical portion of the contract comprised approximately one-third of the total work. Miller-Davis invited bids from several electrical subcontractors, including Premier.

On March 2, 1966, the day before the bids were to be submitted Stanley Wielgos, Premier's vice-president telephoned Paul Hunsberger, assistant division manager of Miller-Davis. Wielgos stated that premier wanted to work with Miller-Davis and requested some assurance that Miller-Davis would work with Premier if Premier was the lowest bidder on the electrical subcontract work. Hunsberger gave no assurances but asked Wielgos to call back at 12:30 on March 3, Wielgos mentioned a base bid of $450,000 to $500,000 during the March 2 conversation.

At 12:30 p.m. on March 3, Wielgos called Hunsberger. Wielgos gave Hunsberger a base bid of $274,100 and an overall bid—the base bid plus the nine alternate bids—of $494,800. Hunsberger said the bid was "very interesting." Wielgos asked, "Do we have a job if you have one?" Hunsberger replied, "If it goes in now, you have a job." Hunsberger then intimated that he would like "sizeable protection" on Premier's price. Both Weilgos and Hunsberger understood that "protection" meant that Premier would submit higher bids to Miller-Davis' competitors so that the latter would have the lowest electrical costs. The submission of inflated bids would nearly insure that Miller-Davis would be the lowest bidder on the prime contract since there was a substantial difference (about $200,000) between Premier's and the other subcontractors' bids for the electrical work. Wielgos accepted this arrangement saying, "[W]e are banking on you getting the job and we are willing to gamble on you and you only."

1. Judge Henry S. Wise is sitting by designation from the United States District Court for the Eastern District of Illinois.

At Hunsberger's suggestion Wielgos called back around 1 p.m. on March 3 to see if Premier's bid was still the lowest. Hunsberger said that it was and told Wielgos "as it stands now, you [have the job]." Wielgos called again at 1:30 p.m. and was told that his was still the lowest bid. Wielgos told Hunsberger that if Premier's bid was not the lowest, he wanted to submit Premier's Miller-Davis' bid to the other general contractors.

During the morning and early afternoon of March 3, Hunsberger received bids from other electrical subcontractors. Around 1:40 p.m. Hunsberger told William Sinclair vice-president and Chicago division manager of Miller-Davis, that another electrical subcontractor, St. Arnaud Electrical Company, had submitted cost figures of $225,000 on the base bid. Sinclair called Joe Abrams, electrical engineer for St. Arnaud, and asked if St. Arnaud would take the job for a base bid of $255,000. Abrams accepted this suggestion five minutes later. Sinclair incorporated St. Arnaud's electrical base bid in Miller-Davis' overall bid estimate and contacted Richard Larson, a Miller-Davis employee, who actually submitted the bid at the Argonne facilities. Miller-Davis subsequently was awarded the contract with the Atomic Energy Commission and a written contract was executed. Miller-Davis, in turn, awarded the electrical subcontract to St. Arnaud.

On March 3 and 4 Wielgos called Hunsberger several times and asked if Premier's figures had been used in the Miller-Davis' bid. Hunsberger refused to answer this inquiry. In a conversation on March 4, Wielgos angrily asked Hunsberger whether or not there had been an "agreement" between Premier and Miller-Davis. Hunsberger admitted that there had been.

On these facts the district court held that no contract was formed since the dealings between the parties did not possess the requisites of a formal contract.[2] The court further held that even if a contract was formed, it, nevertheless, would be unenforceable because of the illegality of its terms. Since we affirm the district court's holding that no contract was formed, we need not consider the alternate holding that the contract was illegal.

■ If the rules ordinarily applicable to the formation of subcontracts are applied in this case, the communications between Premier and Miller-Davis constitute, at best, negotiations preliminary to the formation of a contract. The submission of a bid for a subcontract is an offer. 1 Corbin, Contracts § 24 (1950). Acceptance of a subcontractor's bid generally occurs only when a written contract specifically setting out the terms of the agreement is entered into by the general contractor and the subcontractor. Plumbing Shop, Inc. v. Pitts, 67 Wash.2d 514, 408 P.2d 382 (1965). The use of a subcontractor's bid by a general contractor in preparing his bid on the prime contract does not constitute acceptance of the offer, Merritt-Chapman & Scott Corp. v. Gunderson Bros. Engineering Corp., 305 F.2d 659 (9th Cir. 1962). Williams v. Favret, 161 F.2d 822 (5th Cir. 1947). Many courts have held that the same rule applies even if the general contractor is awarded the prime contract. Baird Co. v. Gimbel Bros., 64 F.2d 344 (2d Cir. 1933); *but cf.* Drennen v. Star Paving, 51 Cal.2d 409, 333 P.2d 757 (1958). Since Premier's bid was not used in Miller-Davis' final bid and was not accepted through the formation of a written contract, no contract was formed.

■ Premier argues, however, that the ordinary rules do not apply in this case. We agree that proof of business custom or evidence of express intent to the contrary can modify the general rules set out above and demonstrate that the parties intended that a contract be formed prior to the signing of a written agreement. Industrial Electric-Seattle,

2. The district court's opinion is reported at 291 F.Supp. 295 (N.D.Ill.1968).

Inc. v. Bosko, 67 Wash.2d 783, 410 P.2d 10 (1966), cf. Traff v. Farbo, 337 Ill. App. 83, 84 N.E.2d 874 (1949). Premier has offered no evidence of business custom contrary to these rules and instead relies only upon the conversations between Wielgos and Hunsberger to demonstrate that Miller-Davis accepted Premier's bid.

■ Premier makes two arguments. Premier first contends that during the telephone conversations on March 3 Miller-Davis accepted Premier's bid in return for "protection" provided by Premier subject to the condition that the general contract was ultimately awarded to Miller-Davis. The district court found, and we agree, that the evidence fails to support this contention. On the contrary, those conversations indicate that both parties retained their freedom to withdraw at any time. Thus, Hunsberger repeatedly emphasized to Wielgos that Premier was entitled to nothing if a lower bid was made by another subcontractor. Wielgos understood this to be the case as evidenced by his repeated questioning of Hunsberger concerning how his bid was "holding up" and by his assertion in the 1:30 p.m. conversation on March 3 that he wished to publish his Miller-Davis' bid to other general contractors in the event that his bid was not the lowest.

■ Premier's second argument asserts that Premier and Miller-Davis entered into a much more complicated arrangement. In return for "protection" it is alleged that Miller-Davis orally accepted Premier's bid subject to the following conditions: that Premier was the lowest bidder; that Miller-Davis used Premier's bid in preparing its prime bid; and that Miller-Davis was awarded the prime contract. The district court found that such an agreement had been formed, relying primarily on a vague admission by Hunsberger in the telephone conversation with Wielgos on March 4. Nevertheless this agreement standing alone would be insufficient to give Premier a cause of action since St. Arnaud's bid was lower than Premier's and was used in calculating Miller-Davis' bid on the general contract. The district court found, however, that a collateral promise existed whereby Miller-Davis agreed not to inform anyone of the exact amount of Premier's bid. The court further found that this collateral promise was breached and that Miller-Davis was estopped from denying that Premier's bid was lowest. We disagree. The record contains little evidence that such a promise was made and no evidence that Miller-Davis informed St. Arnaud or anyone else of the exact amount of Premier's subcontract bid to Miller-Davis. Therefore, even if we were to agree that the complicated arrangement set out above actually existed, there is no evidence that its conditions were breached. Thus we hold that no contract was formed. Miller-Davis advances several additional defenses to Premier's claim that an enforceable contract was formed between Miller-Davis and Premier.[3] In light of our holding these additional arguments need not be considered.[4]

### The Antitrust Action

The antitrust action instituted by Premier was filed subsequent to its action

3. Miller-Davis argues that the contract contemplated by the parties involved complicated and detailed provisions not discussed by Hunsberger and Wielgos. Therefore, since the alleged oral contract involved only the price of the subcontract work, it lacked sufficiently definite terms to create a contract between Miller-Davis and Premier. Miller-Davis further argues that any contract so formed would be invalid under the statute of frauds. Finally, Miller-Davis argues that Premier suffered no damages since St. Arnaud lost money in the performance of the subcontract work.

4. The district court accepted Miller-Davis' first argument, holding that the alleged oral agreement was indefinite and unenforceable. Plumbing Shop, Inc. v. Pitts, 67 Wash.2d 514, 408 P.2d 382 (1965). The district court did not reach Miller-Davis' statute of frauds and the damages defenses.

based on contract and was heard by a different district judge. On September 16, 1968, seven days prior to the decision on the merits in the contract action, Premier's antitrust action was dismissed following a motion for judgment on the pleadings.[5] The district court held that Premier was barred from maintaining its action against Miller-Davis and St. Arnaud under the doctrine of *in pari delicto*. The court further held that the doctrine of res judicata prevented Premier from asserting its antitrust claim against Miller-Davis. In those rulings the district court erred.

In considering Premier's appeal from the dismissal of its antitrust claim we are limited to the pleadings which were before the district court. The essential allegations of Premier's complaint are contained in paragraphs 9 and 11.[6] In paragraph 9 Premier alleged that Miller-Davis and St. Arnaud entered into a conspiracy to induce St. Arnaud's competitors to submit inflated electrical subcontract bids to Miller-Davis' competitors. Miller-Davis would obtain the general contract as a result and thereafter would award the electrical subcontract to St. Arnaud on a noncompetitive basis. Paragraph 11 alleges that Miller-Davis induced Premier to submit higher electrical subcontract bids to Miller-Davis' competitors and assured Premier that it would in return receive the electrical subcontract.

On the basis of these pleadings the agreement between Miller-Davis and Premier constitutes a per se violation of the Sherman Act. By preventing Premier from submitting bids to other general contractors at the same prices made available to Miller-Davis, the agreement constitutes a concerted refusal to deal. Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 213, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). The general contractors where thereby denied meaningful access to the market for the Argonne project contract. United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). Thus, on similar facts the court in Mechanical Contractors Bid Depository v. Christiansen, 352 F.2d 817 (10th Cir. 1965), cert. denied 384 U.S. 918, 86 S.Ct. 1365, 16 L.Ed.2d 439 (1966), held that a bid depository agreement which prevented the plaintiff-subcontractor from submitting competitive bids to general contractors was illegal under the antitrust laws. We also believe the agreement violates the prohibition against price restraints. As the Supreme Court said in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223,

---

5. The district court's opinion is reported at 292 F.Supp. 213 (N.D.Ill.1968).

6. Paragraph 9 of the complaint reads:
 9. That sometime between January 15, 1966, and March 3, 1966, the defendants by and between themselves conspired to restrict the competition of the defendant, Miller-Davis Company, for the said A.E.C. contract in that the defendants entered into a secret agreement wherein the defendant, Miller-Davis Company, would induce the defendant, St. Arnaud Electric Company's competitors, including the plaintiff as hereinafter set forth, to submit substantially higher bids to defendant, Miller-Davis Company's competitors thereby insuring that the defendant, Miller-Davis Company, would be the successful bidder, who in turn would then award the electrical subcontract to the defend-

ant, St. Arnaud Electric Company, on a noncompetitive basis.

Paragraph 11 of the complaint reads:
 11. That on March 3, 1966, plaintiff submitted by telephone its oral bid to the defendant, Miller-Davis Company; that at the time that plaintiff submitted its bid to the said defendant, the said defendant in furtherance of the said secret agreement between the defendants, advised plaintiff that it was the low bidder as of the time and date the bid was received, and further advised plaintiff that if plaintiff would "protect" the defendant, Miller-Davis Company, by submitting higher electrical bids to said defendant's competitors, it would award plaintiff the electrical subcontract providing that the defendant, Miller-Davis Company, was the successful bidder with the A.E.C.

60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940): "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price * * * is illegal per se." The intended effect and probable result of the agreement here was to cause a higher overall price on the Argonne project contract than would otherwise have prevailed.

■ . The defendants rely upon Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), to establish their contention that the illegality of Premier's conduct forecloses its right to maintain this suit. In *Perma Life*, Mr. Justice Black writing for five members of the Court said, " * * * the doctrine of *in pari delicto*, with all its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action. * * *" Perma Life Mufflers v. International Parts Corp., supra at 140, 88 S.Ct. at 1985. We believe that *Perma Life* stands for a more limited rule, however, since Mr. Justice Black expressly reserved the question " * * * whether such truly complete involvement and participation in a monopolistic scheme could ever be a basis, wholly apart from the idea of *in pari delicto*, for barring the plaintiff's cause of action * * *." Perma Life Mufflers v. International Parts Corp., *supra* at 140, 88 S.Ct. at 1985. On the basis of the pleadings before him, Mr. Justice Black found that plaintiffs' participation in the illegal agreement with Midas was "not voluntary in any meaningful sense" and that they "accepted many of these restraints solely because their acquiescence was necessary to obtain an otherwise attractive business opportunity." Perma Life Mufflers v. International Parts Corp., *supra* at 139, 88 S.Ct. at 1985. Thus we believe that *Perma Life* holds only that plaintiffs who do not bear equal responsibility for creating and establishing an illegal scheme, or who are required by economic pressures to accept such an agreement, should not be barred from recovery simply because they are participants.

■ Many factors are, therefore, relevant in determining whether participation by the plaintiff in an illegal agreement constitutes a defense to his treble damage action. Difficult factual questions are involved in making such a determination. This is especially true where, as here, the plaintiff and defendant are not competitors but instead are dealing at arm's length in a vertical relationship in the purchase and sale of goods and services. In such cases the relative bargaining power of each party to the agreement is relevant in ascertaining whether the plaintiff was forced by economic pressures to enter into the agreement. Similarly, evidence concerning the formation of the agreement including facts pertaining to which party initiated each of its provisions may control the availability of the defense in particular situations.

■ The district court erred in holding that these factual questions were sufficiently resolved by the allegations of the pleadings. In antitrust cases where factual questions play important rules, summary procedures should be avoided. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). On the basis of the pleadings before us we cannot say that Miller-Davis did not possess sufficient bargaining power in its dealings with Premier to force Premier to offer protection to Miller-Davis. Furthermore, the factual question of who actually initiated the protection scheme is completely unresolved by the pleadings. Remand of this case will allow these and other questions to be more fully considered.

■ The district court, in an alternate holding determined that Premier's action against Miller-Davis was barred by the doctrine of res judicata. We disagree. Before a prior action can be res judicata, a final judgment in that

action must be rendered. Sypert v. Miner, 266 F.2d 196 (7th Cir. 1959); Muchard v. Berenson, 307 F.2d 368 (9th Cir. 1962). Therefore, since final judgment had not been rendered in the contract action when the decision was announced in the antitrust action, res judicata was inappropriate.

 Miller-Davis, without citing authority, maintains that this defect is now cured since final judgment has been entered in the contract action and that we should therefore affirm the district court's alternate holding. Assuming without deciding that we could affirm the district court on this basis, we, nevertheless, think that res judicata would be inapplicable to bar Premier's antitrust claim.[7] The cases cited by Miller-Davis including Engelhardt v. Bell & Howell Co., 327 F.2d 30 (8th Cir. 1964), and Norman Tobacco & Candy Co. v. Gillette Safety Razor Co., 295 F.2d 362 (5th Cir. 1961), are distinguishable. The allegations of the contract and antitrust complaints here allege essentially different causes of action growing out of different operative facts.[8] The antitrust claim rests primarily upon a conspiracy between Miller-Davis and St. Arnaud to deceive Premier occurring prior to any dealings between Premier and Miller-Davis. Although the difficulty of proving such a conspiracy may be great, we believe the complaint alleges injury to Premier wholly apart from breach of contract.

For these reasons the judgment in appeal 17312 is affirmed and the judgment in appeal 17290 is reversed and remanded for trial.

---

7. Miller-Davis does not argue and we do not decide whether the doctrine of collateral estoppel is applicable to facts proved in the contract action in determining the availability of the defense of *in pari delicto* in this case.

8. The district court apparently recognized that res judicata was inappropriate and based his dismissal of Premier's action against Miller-Davis in part on the ground of comity. In light of our holding that the antitrust and contract actions constitute separate causes of actions, we believe that comity would, at most, have justified a stay of the antitrust action pending the outcome of the contract action.