**MIDWAY ENTERPRISES, INC.**

v.

**PETROLEUM MARKETING CORP.**
Civ. A. No. 73–1178–N.

United States District Court,
D. Maryland.

May 16, 1974.

Robert G. Levy, Peter H. Gunst, and Allan P. Hillman, Baltimore, Md., for plaintiff.

David F. Albright, Richard M. Kremen, and Semmes, Bowen & Semmes, Baltimore, Md., for defendant.

NORTHROP, Chief Judge.

This matter comes before the Court on motion of defendant, Petroleum Marketing Corp. (hereafter PMC), to dismiss on the grounds that plaintiff, Midway Enterprises, Inc. (hereafter Enterprises), lacks standing to sue with regard to wholesale price fixing and is barred by the doctrine of *in pari delicto* from seeking relief as to alleged retail price fixing.

Plaintiff has brought this action for damages and injunctive relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. The complaint alleges that plaintiff is an independent retailer of petroleum products in the Baltimore metropolitan area. It has marketed gasoline to the public through some twenty independent service stations, either owned or leased by plaintiff. Plaintiff purchased substantially all of its gasoline requirements from Midway Petroleum, Inc. (hereafter Midway), a separate and distinct corporation. Midway was a major gasoline wholesale customer of the defendant PMC and of its alleged co-conspirators.

It is further alleged that the defendant PMC is a wholly owned marketing subsidiary of CORCO, a major refiner of petroleum products. PMC sells gasoline both to independent retailers, such as plaintiff, and to its own service stations operating under the "Scot" brand.

The complaint charges that the defendant and other suppliers of independent service stations conspired to raise, fix, maintain and stabilize the wholesale prices of gasoline in Maryland, Virginia and the District of Columbia. In furtherance of the conspiracy, the defendant and alleged co-conspirators did the following: raised, fixed and stabilized wholesale and retail gasoline prices at agreed levels; exchanged information relating to changes in wholesale and retail prices; sought and obtained assurances that retail prices charged by service stations owned by independent dealers and by defendant and co-conspirators would be raised and maintained; and instructed and coerced independent dealers to raise retail prices to levels agreed upon among the defendant and other suppliers. Plaintiff alleges that as a result of this activity it has been required to purchase gasoline at excessive prices and, as a direct result thereof, suffered such losses in sales and profits as to lead to the destruction of its business.

Defendant contends that in terms of wholesale prices any injury allegedly suffered by the plaintiff was indirect and therefore not compensable by a private treble damages action under section 4 of the Clayton Act. Defendant further argues that relief cannot be sought as to retail prices as plaintiff fully and voluntarily participated in the alleged unlawful scheme, and cites an affidavit to the complaint as evidence for this assertion.

It is axiomatic that a complaint should not be dismissed for failure to state a claim upon which relief may be granted unless it appears to a certainty that plaintiff is not entitled to recover under any state of facts which may be proved to support his claim. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Wolman v. Tose, 467 F.2d 29 (4th Cir. 1972). Equally established is the rule that, on a motion to dismiss, the facts are to be taken in the light most favorable to the plaintiff. Jenkins v. McKeithen, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); Wolman v. Tose, *supra*.

## I.

Plaintiff seeks to maintain this suit under section 4 of the Clayton Act which provides as follows:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

Despite the apparent broad scope of the statute. courts traditionally have limited the availability of this remedy to those individuals who have been directly injured by the alleged violation of the antitrust laws. The standing requirement is not satisfied merely by proof that some adverse effect on the plaintiff can be traced to the defendant's unlawful activity. E. Pollock, *Standing to Sue, Remoteness of Injury, and the Passing-On Doctrine*, 32 A.B.A. Antitrust L.J. 5(1966).

The earliest formulation of what has become known as the "direct-injury" test arose in Loeb v. Eastman Kodak Co., 183 F. 704 (3rd Cir. 1910). In *Loeb,* the plaintiff was both a stockholder and a creditor of a bankrupt corporation. It was alleged that the firm had been driven into financial ruin by the defendant's antitrust violations, with the result that the plaintiff suffered a total loss on his stock investment and unsecured claim. Notwithstanding, the Third Circuit held that the plaintiff did not have standing to maintain a cause of action. The court pointed out that no conspiracy against the plaintiff as stockholder or creditor had been alleged and that the injury complained of was directed at the corporation. "Hence, any injury which . . . [the plaintiff] received was indirect, remote, and consequential." *Id.* at 709. Subsequent decisions have interpreted *Loeb* to require that the plaintiff have direct relations (be in privity of contract) with the defendant. Thus, standing has been denied to a landlord of a lessee whose business has been injured, Lieberthal v. North Country Lanes, Inc., 221 F.Supp. 685 (S.D.N.Y.1963); Erone Corp. v. Skouras Theatre Corp., 166 F.Supp. 621 (S.D.N.Y.1957); Melrose Realty Co. v. Loew's, Inc., 234 F.2d 518 (3rd Cir. 1956); to a patent licensor of an injured licensee, SCM Corp. v. Radio Corp. of America, 407 F.2d 166 (2nd Cir.), cert. denied, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969); Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678 (2nd Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L. Ed. 818 (1956); to a supplier of ingredients to an injured customer, Volasco Prods. Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); Snow Crest Beverages, Inc. v. Recipe Foods, Inc., 147 F.Supp. 907 (D. Mass.1956); to a partner of an injured partnership, Coast v. Hunt Oil Co., 195 F.2d 870 (5th Cir. 1952), cert. denied, 344 U.S. 836, 73 S.Ct. 46, 97 L.Ed. 651 (1952); to a franchisor of an injured franchisee, Nationwide Auto Appraiser Service, Inc. v. Association of Casualty & Surety Companies, 382 F.2d 925 (10th Cir. 1967); to an insurance agent representing an injured underwriter, Miley v. John Hancock Mut. Life Ins. Co., 148 F.Supp. 299 (D.Mass), aff'd, 242 F.2d 758 (1st Cir.), cert. denied, 355 U. S. 828, 78 S.Ct. 38, 2 L.Ed.2d 41 (1957); and to members of an injured association, Schwartz v. Broadcasting Music, Inc., 180 F.Supp. 322 (S.D.N.Y.1959). In each of these cases, the plaintiff was not the party which suffered the immediate injury but whose loss resulted from his relationship with another entity.

Because of the strict interpretation given the "direct-injury" test, the number of private antitrust actions was severely limited. As an outgrowth of this development, there evolved among several of the circuits the "target area" theory which expanded the concept of stand-

ing. The leading case is Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9th Cir. 1955). The Karseal Corporation manufactured automobile polish under the trade name "Wax Seal" and sold it to enfranchised but independently owned distributors. The latter in turn resold the product to independent service stations. The defendant, a sponsor of polishes other than "Wax Seal," allegedly entered into exclusive dealing contracts with the service stations thereby reducing the distribution and sales of "Wax Seal." The Ninth Circuit framed the issue before it as thus:

> [W]as Karseal within the "target area" of Richfield's illegal practices . . . ? Assuming Karseal was "hit" by the effect of the Richfield antitrust violations, was Karseal "aimed at" with enough precision to entitle it to maintain a treble damage suit under the Clayton Act? [221 F.2d at 362].

Since the illegal acts were directed against the manufacturers and distributors of competing products, including plaintiff's wax, the court held that "Karseal was within the target area of the illegal practices of Richfield; that Karseal was not only hit, but was aimed at, by Richfield." Id. at 365. Under this theory, then, an injured plaintiff need show only that he was within the area of the economy endangered by the antitrust violation. It is not necessary that the plaintiff be in direct competition with the defendant or that there be a direct contractual relationship between the parties. South Carolina Council of

Milk Producers, Inc. v. Newton, 360 F. 2d 414 (4th Cir.), cert. denied, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966); Johnson v. Ready Mix Concrete Co., 318 F.Supp. 930 (D.Neb.1970). Nor is it necessary to prove that it was defendant's purpose to injure this particular plaintiff. Twentieth Century Fox v. Goldwyn, 328 F.2d 190 (9th Cir.), cert. denied, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964).

In the only case which has confronted it on the issue of standing under the antitrust laws, the Fourth Circuit adopted the "target area" approach despite seemingly inconsistent language.[1]

In South Carolina Council of Milk Producers, Inc. v. Newton, supra, an action was brought by an association representing milk producers who sold raw milk to milk processors. The defendants purchased the processed milk and sold it in its own retail stores. The alleged antitrust violations related to defendants' use of milk as a "drawing card" or "loss leader" item for its stores, thus depressing the price of the commodity to the point of threatening the economic existence of the dairy industry. The trial court sustained the motion to dismiss reasoning that because of lack of privity of contract, direct relationship or mutual competition between the plaintiff milk producers and the defendants, the plaintiffs were not persons injured under the Clayton Act. The Court of Appeals reversed holding that:

> If a plaintiff can show himself within the sector of the economy in which the violation threatened a

---

[1]. Because *South Carolina Council* employs the "target" language as well as the terms "proximate," "consequential," and "remote," it is not absolutely clear as to which approach the court has adopted. Principally, it relied on the *Karseal* decision from which the more liberal theory of standing originated.

Various authorities have interpreted *South Carolina Council* as following the "target area" concept. *See* Note, 46 S.Cal.L.Rev. 98, 110 n. 9 (1972); Note, 24 Vand.L.Rev. 803, 805 n. 14 (1971). Approving the "target area" approach, the Eighth Circuit in Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679, 688–689 (8th Cir.

1966) relied upon *Karseal* and *South Carolina Council* as sound and persuasive precedent. In Minersville Coal Co. v. Anthracite Export Ass'n, 335 F.Supp. 360, 365 (M.D.Pa.1971), Judge Muir recognized that *South Carolina Council* followed the more liberal rule:

> Were we not of the opinion that the law of this Circuit [Third] is still that laid down in *Melrose Realty* [barring a lessor], we would be inclined to follow the approach of the Fourth Circuit in *South Carolina* [full citation omitted] in which it was held that standing to sue is not limited to those in direct contractual or competitive status with the defendant . . . .

breakdown of competitive conditions and that he was proximately injured thereby, then he has standing to sue under section 4. See . . . Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9 Cir. 1955). This sector is sometimes designated as the "target area" of the defendants' illegal practices. [360 F.2d at 418].

It found that the action could be maintained even though plaintiffs did not sell directly to defendants, and the milk was processed between the time plaintiffs sold it and when it was purchased by defendants. The court stated that the antitrust laws did not require that the parties be in a direct contractual or competitive relationship:

" 'Under the Clayton Act the right is not confined to persons in privity with the wrongdoer, but is given to anyone who has suffered injury to his business or property by reason of the wrongful acts.' " [360 F.2d at 419] [quoting Karseal Corp. v. Richfield Oil Corp., *supra*, 221 F.2d at 363].

. . . . . .

" 'The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these.' " [360 F.2d at 419] [quoting Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328 (1948)].

But the court said that plaintiffs could not recover if the trial showed that the " . . . damage was merely incidental or consequential, or if the defend-

ants' antitrust acts are so removed from the injury as to be only remotely causative . . . ." *Id.* at 419. This critical determination was to be made by the trial court on the basis of the evidence offered by the plaintiff. Any summary disposition was to be employed sparingly.

This "target area" approach adopted by the Fourth Circuit provides a far more logical and flexible tool to analyze the standing question. Those courts which have adhered to the "direct-injury" test [2] have over-emphasized the relationship between plaintiff and defendant. As a result, where the plaintiff is separated from the antitrust violator by an intermediate party or parties, standing has been denied by attaching the labels "remote," "indirect," and "consequential." Moreover, the "direct-injury" approach has fostered the practice of classifying plaintiffs and denying standing to those which fall in certain categories—lessors, landlords, corporate officers, creditors, suppliers, franchisors, licensors—regardless of the extent of the plaintiff's loss or of any other facts or circumstances. The approach exalts form over substance. In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122, 127 (9th Cir. 1973); *see* Billy Baxter, Inc. v. Coca-Cola Company, 431 F.2d 183, 189 (2nd Cir. 1970) (dissenting opinion).

Courts following the "target area" approach,[3] on the other hand, have focused on the plaintiff's relationship to the area of the economy allegedly injured by the defendant. Thus, to state

---

2. The First, Second, Third, Sixth and Tenth Circuits have generally applied the "direct-injury" test. Miley v. John Hancock Mut. Life Ins. Co., 148 F.Supp. 299 (D.Mass.), aff'd per curiam, 242 F.2d 758 (1st Cir.), cert. denied, 355 U.S. 828, 78 S.Ct. 38, 2 L. Ed.2d 41 (1957); Billy Baxter, Inc. v. Coca-Cola Company, 431 F.2d 183 (2nd Cir. 1970); Kaufman v. Dreyfus Fund, 434 F.2d 727 (3rd Cir. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962); Nationwide Auto Appraiser Service, Inc. v. As-

sociation of Casualty & Surety Companies, 382 F.2d 925 (10th Cir. 1967).

3. The Fourth, Eighth and Ninth Circuits have generally pursued the more liberal "target area" approach. South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir.), cert. denied, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966); Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679 (8th Cir. 1966); Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9th Cir. 1955); In re Western Liquid Asphalt Cases, 487 F.2d 191 (9th Cir. 1973).

a cause of action, the plaintiff must show that he is within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry. Karseal Corp. v. Richfield Oil Corp., *supra*; South Carolina Council of Milk Producers, Inc. v. Newton, *supra*. Standing is denied, however, if the plaintiff's business activity occurs outside that area of the economy. *See* In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, *supra*. The advantage of the "target area" theory, then, is that it examines the circumstances surrounding the purported violation and prevents a defendant from avoiding the sanctions of the antitrust laws by the simple expedient of interposing entities between himself and the plaintiff.

The Supreme Court has not explicitly approved either of these two analyses. In Hawaii v. Standard Oil Co., 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), the Court stated in a footnote that "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Id.* at 263 n. 14. In support, it cited cases from *every* circuit but it failed to distinguish between the two tests employed. However, this Court concurs with the Ninth Circuit's conclusion in *Vehicle Air Pollution* that the High Court implicitly rejected the "direct-injury" test in an earlier decision, Perkins v. Standard Oil Co., 395 U.S. 642, 89 S. Ct. 1871, 23 L.Ed.2d 599 (1968). The issue there was whether a "fourth level" price discrimination fell within the proscription of section 2 of the Clayton Act, as amended by the Robinson-Patman Act. The circuit court had found that there was no causal connection between the supplier's price discrimination and the business of a customer which was four steps removed in the distributive chain. The Supreme Court reversed

stating that the " 'fourth level' . . . limitation is wholly an artificial one and is completely unwarranted by the language or purpose of the Act." *Id.* at 647. It reasoned that there was no basis for immunizing an antitrust violator "simply because the product in question passed through an additional formal exchange before reaching [the victim] . . . . [T]he competitive harm done . . . is certainly no less because of the presence of an additional link in this particular distribution chain from the producer to the retailer." *Id.* at 648. Although a different section of the Clayton Act was involved, the Supreme Court's opinion would argue by analogy against a "direct-injury" analysis. Further support for this conclusion can be found in the fact that the Court relied upon *Karseal* in finding that the plaintiff was entitled to recover.

Turning to the instant case, the determinative question is what sector of the economy is threatened by the alleged practices of the defendant? It is the retail sale of gasoline to the public. The scheme to raise, fix and maintain wholesale prices was inextricably tied to the conspiracy with regard to retail prices. By fixing a high price for gasoline sold to suppliers, it would almost insure that retail prices would rise. Then, too, establishing a high price at the retail market would support any raise at the wholesale level. But the crucial fact here is that, while supplying plaintiff with gasoline, the defendant at the same time was in direct competition through the operation of its own service stations. The Court cannot but conclude that the primary effect of defendant's alleged practices was on the gasoline sold by plaintiff and other independent service stations, which was competitive with that sold by defendant. The ultimate effect was to eliminate the competitive position of the plaintiff and other independents.[4]

---

4. This Court finds support for this conclusion in a most recent decision, not too dissimilar from the matter now pending. In

Michelman v. Clark-Schwebel Fiber Glass Corp., 1974 Trade Cas. ¶ 74,974 (S.D.N.Y., March 14, 1974), a corporation and its de-

The authorities upon which the defendant relies are not persuasive. A number of the opinons apply the "direct-injury" test which has not been adopted in this Circuit. Those cases involving "suppliers" are not on point; they involve situations where there was a long distributive chain, or where the product underwent substantive change, or where allocation of damages among several parties proved difficult. That is not the situation here before this Court. There was one intermediary between plaintiff and defendant through which passed a commodity unaltered by manufacture or process. Allocation of damages does not present an insurmountable obstacle. Consequently, the problems which the old decisions forecasted do not exist in this case.

In dealing with this motion, the Court is not required to make a determination as to whether or not the plaintiff is likely to succeed. It is merely a question of whether the pleadings present a triable antitrust issue and allege an injury caused by defendant's conduct. Here it is asserted that through a conspiracy defendant maintained artificially high wholesale and retail prices which resulted in the demise of plaintiff's business. This is sufficient, under the cases cited, to defeat the motion. Pacific Seafarers, Inc. v. Pacific Far East Line, 48 F.R.D. 347, 351 (D.D.C.1967) (citing *South Carolina Council*).

## II.

Defendant also contends that the plaintiff is barred from seeking relief as to retail price fixing by the doctrine of *in pari delicto*. It argues that plaintiff voluntarily and fully participated in the defendant's alleged conspiracy and points to the affidavit of Howard Everett Knox, attached to the complaint, as evidence:

> *"During the time of my employment with Petroleum Marketing Corp. we were in contact with our competitors- including Hess, Crown, Onco, Zayre's, Merit Saveway, Holmes Oil, . . . Midway [Enterprises] . . . in constant effort to coordinate and gain agreement by these companies concerning retail price movements in the marketplace. The attitude of Petroleum Marketing Corp. and the other independent marketers of gasoline, was that the independents had to stick together on price movements.* We had enough competition from the major marketers, we felt, so that there was nothing to be gained in cutting each others throats with price competition among ourselves. *Therefore, whenever there was a price move contemplated, the independents got together to agree on their movements."* [Emphasis added by defendant in motion to dismiss].

The plaintiff relies upon Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L. Ed.2d 982 (1968) as barring the defense of *in pari delicto*. In *Perma Life*, a private treble damage action was brought by several parts dealers who had entered into exclusive dealership contracts with the defendants, manufacturers of mufflers and exhaust system parts. Defendants claimed that the plaintiff dealers voluntarily entered into Midas Muffler dealership arrangements with full knowledge of the restrictive contract provisions. Reversing the circuit court which had sustained the defense, Mr. Justice Black speaking for five members

pendent subsidiary alleged that the defendant supplier conspired to raise the price of fiberglass fabrics sold to plaintiffs. In its motion for summary judgment, the defendant contended that the subsidiary lacked standing to sue since it was an indirect purchaser. Rejecting that argument, the district court held:

> Insofar as concerns [the subsidiary], the alleged consequences of the acts complained of would appear clearly to have impaired its ability to compete . . . .. Defendants concede that the [subsidiary] acquired materials and labor from [its parent]. Since [the parent corporation] alleges that it purchased fiberglass at artificially inflated prices, [its subsidiary] sustained compensable antitrust damages when the illegal overcharge was "passed on" to it by [its parent]. [Citations omitted].

of the Court found that "[t]here is nothing in the language of the antitrust acts which indicates that Congress wanted to make the common-law *in pari delicto* doctrine a defense to treble-damage actions. . . ." *Id.* at 138. Therefore, it was held that "the doctrine of *in pari delicto,* with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action." *Id.* at 140. However, the majority opinion reserved the question of "whether such truly complete involvement and participation in a monopolistic scheme could ever be a basis, wholly apart from the idea of *in pari delicto,* for barring the plaintiff's cause of action. . . ." *Id.* at 140. The Court found that, in the case before it, the plaintiff's participation in the illegal agreement "was not voluntary in any meaningful sense" and that they "accepted many of these restraints solely because their acquiescence was necessary to obtain an otherwise attractive business opportunity." *Id.* at 139.

That some defense of illegality is viable in antitrust actions is substantiated by the three concurring opinions in *Perma Life.* Mr. Justice White stated that he "would deny recovery where plaintiff and defendant bear substantially equal responsibility for injury resulting to one of them but permit recovery in favor of the one less responsible where one is more responsible than the other." *Id.* at 146. Certain factors were important in making this determination: facts as to the relative responsibility for originating, negotiating, and implementing the scheme; evidence as to who might reasonably have been expected to benefit from the provision or conduct making the scheme illegal; proof of whether one party attempted to terminate the arrangement and encountered resistance or countermeasures from the other; and facts showing who ultimately profited or suffered from the agreement. Taking the same approach, Mr. Justice Fortas stated that "if the fault of the parties is reasonably within the same scale . . . then the doctrine should bar recovery." *Id.* at 147. This was espe-

cially true when the plaintiff originated and insisted upon the illegal restraint. Also concurring, Mr. Justice Marshall contended that a "limited application of the basic principle behind the doctrine of *in pari delicto* is both proper and desirable in the antitrust field. . . . [W]here a defendant in a private antitrust suit can show that the plaintiff actively participated in the formation and implementation of an illegal scheme, and is substantially equally at fault, the plaintiff should be barred from imposing liability on the defendant." *Id.* at 149.

At least two circuit courts have interpreted *Perma Life* to stand for a limited rule. In Premier Electrical Constr. Co. v. Miller-Davis Co., 422 F.2d 1132 (7th Cir. 1970), the Seventh Circuit found *Perma Life* to hold "only that plaintiffs who do not bear equal responsibility for creating and establishing an illegal scheme, or who are required by economic pressures to accept such an agreement, should not be barred from recovery simply because they are not participants." *Id.* at 1138. The court enumerated two facts that were relevant in ascertaining whether participation by the plaintiff constituted a defense: (1) the relative bargaining power of each party to the agreement; and (2) evidence concerning the formation of the agreement including which party initiated it.

■ More significant, in terms of this Court, is the construction given by the Fourth Circuit in Columbia Nitrogen Corp. v. Royster Co., 451 F.2d 3 (4th Cir. 1971). Judge Butzner found that the case of a non-coercive reciprocal agreement was the type of which the Supreme Court had excluded from the scope of its opinion in *Perma Life.* The circuit court interpreted the various opinions to mean "that when parties of substantially equal economic strength mutually participate in the formulation and execution of the scheme and bear equal responsibility for the consequent restraint of trade, each is barred from seeking treble damages from the other." *Id.* at 15–16.

This Court cannot conclude at this time that the plaintiff voluntarily and fully participated in the illegal restraint. The only conclusion which can be drawn from the Knox affidavit is that the plaintiff did participate in some fashion. On the face of the pleadings, this Court cannot say that plaintiff was of equal bargaining power with defendant. Furthermore, the factual question of who initiated the illegal scheme and the nature and scope of participation are completely unresolved. These factual questions cannot be resolved by allegation. Summary procedures should be avoided where factual questions are important. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Premier Electrical Construction Co. v. Miller-Davis Co., *supra*, 422 F.2d at 1137; Skouras Theatres Corp. v. Radio-Keith-Orpheum Corp., 58 F.R.D. 357, 360 (S.D.N.Y.1973).

For the above reasons, this Court entered its Order in open court on May 13, 1974, denying the motion to dismiss filed by defendant, Petroleum Marketing Corp.