Thomas BLACKBURN and Raymond
T. Green, Plaintiffs–Appellants,

v.

Charles SWEENEY, Jr. and Daniel H.
Pfeifer, Defendants–Appellees.

No. 94–2737.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 16, 1995.

Decided May 3, 1995.

As Amended on Denial of Rehearing
and Suggestion for Rehearing
En Banc June 15, 1995.

Philip A. Whistler, argued, Melissa R. Garrard, Ice, Miller, Donadio & Ryan, Indianapolis, IN, for plaintiffs-appellants.

Ronald E. Elberger, George E. Purdy, George T. Patton, Jr., argued, Bose, McKinney & Evans, Indianapolis, IN, for defendants-appellees.

Before CUMMINGS, CUDAHY and ROVNER, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiffs Blackburn and Green charge that the "Withdrawal from Partnership Agreement" that they entered with their former law partners, Sweeney and Pfeifer, constitutes a horizontal agreement to allocate markets in violation of § 1 of the Sherman Act. They thus seek to enjoin its enforcement and to collect treble damages under § 4 of the Clayton Act.

## Background

Defendants Sweeney and Pfeifer practice law in South Bend, Indiana; plaintiffs Blackburn and Green practice law in Fort Wayne and Lafayette, Indiana. The four previously specialized in plaintiffs' personal injury law together in the firm of Sweeney, Pfeifer & Blackburn, which actually consisted of three separate partnerships corresponding to the offices in Lafayette, Fort Wayne and South Bend. Green, however, was not a partner in the South Bend partnership. Sweeney and Pfeifer practiced out of the main office in South Bend while Blackburn and Green manned the satellite offices in Fort Wayne and Lafayette. The firm attracted most of their clients through heavy television and yellow page advertising.

In July 1992 Sweeney and Pfeifer brought an action against Blackburn and Green in state court alleging misappropriation of partnership funds. The state court found that Blackburn and Green had diverted partnership funds in breach of the Fort Wayne partnership agreement. The court entered an order on August 4, 1992, requiring an accounting by Blackburn and Green and the dissolution of the Fort Wayne and Lafayette partnerships. The order further specified the steps to be taken to facilitate the disentanglement, including the return of files to the different offices and the sending of notice

to clients advising them of their right to be represented by the attorney of their choice.

On September 3, 1992, the parties signed an "Agreement to Withdraw From Partnerships" ("Agreement")—the result of a month of negotiations and 25 iterations. On September 8, 1992, pursuant to their newly hammered out agreement, Sweeney and Pfeifer dismissed their state court action with prejudice stipulating that unaccounted-for money had been "utilized for law office purposes" and that neither Blackburn's nor Green's conduct constituted "a basis for any criminal action or violation of the Code of Professional Responsibility of Indiana."

Three months after signing the Agreement, in December 1992, Blackburn and Green brought an action in Indiana state court seeking a declaratory judgment that the Agreement was void and unenforceable under Rule 5.6 of the Indiana Rules of Professional Conduct.[1] The challenged portion of the Agreement provides:

> Sweeney and Pfeifer shall not directly or indirectly, within the areas described on Exhibit "A" attached hereto, do any advertising, including but not limited to, television, radio, newspapers, billboards, direct mail or yellow pages. In consideration of the agreement contained in paragraph 2 herein, Blackburn and Green shall not directly or indirectly, within the areas described on Exhibit "B" attached hereto, do any advertising, including but not limited to television, radio, newspapers, billboards, direct mail or yellow pages.

On July 25, 1994, the Indiana court of appeals reversed a grant of summary judgment to defendants and held that the Agreement not to advertise violated Rule 5.6 and that the entire Agreement was therefore unenforceable. The Indiana Supreme Court granted a transfer and oral argument was set for April 5, 1995.

In the interim, on July 15, 1993, Blackburn and Green filed their two-count complaint in

the present action in the district court for the Northern District of Indiana. Count I alleged a *per se* violation of § 1 of the Sherman Act. Count II alleged, in the alternative, that the Agreement was illegal under the Rule of Reason. Blackburn and Green sought declaratory and injunctive relief prohibiting the enforcement of the Agreement, treble damages, costs, and attorneys' fees. In March 1994, the district court granted summary judgment to defendants on Count I finding that the advertising Agreement was not a market allocation. A few months later in a separate order, the district court granted summary judgement to the defendants on Count II as well.

## Discussion

1. *Per se* violation

◼ Horizontal agreements to allocate markets among competitors are *per se* violations of § 1 of the Sherman Act. *United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), *Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990). Defendants contend that because all parties to the Agreement can still practice law in all parts of Indiana, the mutual geographic restrictions on advertising do not constitute an allocation of markets and are thus not subject to *per se* treatment. Defendants are mistaken. To fit under the *per se* rule an agreement need not foreclose all possible avenues of competition. In *Topco* only 10% of the goods sold by the member stores carried the Topco brand—the object of the geographical market allocation held to be a *per se* violation. Similarly in *United States v. Cooperative Theatres of Ohio, Inc.,* 845 F.2d 1367 (6th Cir.1988), the court held that an agreement not to actively solicit a competitor's customers was a *per se* violation even though the parties remained free to compete for new customers.

---

1. Rule 5.6 provides
   A lawyer shall not participate in offering or making:
   (a) a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an

agreement concerning benefits upon retirement; or
(b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties.

The purpose of the advertising Agreement was, as testified to by defendant Sweeney, to "really trade markets.... We, in effect, said that'll be your market" (Pl.App. tab 8). Both parties in this case represent plaintiffs in personal injury cases and rely heavily on advertising as their primary source of clients. Sweeney further testified that he attributes more than 50% of Sweeney & Pfeifer's fee income to advertising on which the firm spends approximately one hundred thousand dollars a year. At oral argument, counsel for Blackburn and Green put the percentage of clients brought in by advertising at 90%. Whichever figure is accepted, the reciprocal Agreement to limit advertising to different geographical regions was intended to be, and sufficiently approximates an agreement to allocate markets so that the *per se* rule of illegality applies.

■ In a further attempt to avoid *per se* treatment, defendants contend that the Agreement not to advertise in each other's territories is ancillary to the agreement to dissolve the partnership and therefore subject to Rule of Reason analysis. The claim is that the advertising restriction is a limited covenant not to compete that is part of a larger agreement, the overall effect of which is pro-competitive. If this model fit, the agreement would be evaluated under the Rule of Reason and would be lawful if neither firm had market power. See *Polk Bros., Inc. v. Forest City Enterprises, Inc.,* 776 F.2d 185, 189 (7th Cir.1985); *United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 280–83 (6th Cir.1898) (Taft, J.), affirmed, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

At first blush this characterization of the Agreement seems plausible. As members of a single firm, plaintiffs and defendants were not competing for clients. The dissolution of the partnership into two competing economic units cannot but have a positive effect on competition in the market generally. That this increase in competition is partly tempered by the restrictions on advertising, perhaps to ensure an orderly transitional period, does not change the fact that the overall effect is pro-competitive. On closer scrutiny, however, this picture breaks down.

*Polk* teaches that courts must look to the time an agreement was adopted in assessing its potential for promoting enterprise and productivity—or, in this case, competition in the legal market. 776 F.2d at 189. In *Polk,* this court held that the *per se* rule did not apply to an agreement between two stores not to sell overlapping items because the agreement was entered to facilitate a joint venture between the two firms to build a structure to house both stores. Because the stores sold generally complementary items, the joint venture promised not only an increase in retail capacity, but also added convenience to customers. Because the limited agreement not to sell certain competing products may have "contribute[d] to the success of a cooperative venture that promises greater productivity and output," it was an ancillary restraint and not subject to the *per se* rule. *Id.*

The Agreement fails under this analysis for two reasons. First, at the time it was entered it was not necessary for the dissolution of the partnership and the resulting potential increase in competition. Sweeney and Pfeifer had already sued to dissolve the partnership and the judge had ordered the dissolution. The Agreement therefore was not a necessary condition for the increased competition resulting from the split-up of the partnership: the fission had occurred and the partnership was essentially over at the time the Agreement was entered. Starting then with the actual status quo of a dissolved partnership, the only effect of the Agreement was to limit the potential competition between the resulting firms. The agreement is thus analogous to a post-termination agreement not to compete that is entered after the employment relationship is over rather than as a condition of employment.

Defendants' contention that the advertising Agreement is a legitimate covenant not to compete, ancillary to the dissolution of the partnership, is further undermined by the Agreement's infinite duration. Defendants now argue that the five-year period for the payment of a portion of the profits from the Fort Wayne and Lafayette offices to Sweeney and Pfeifer applies to the limitations on advertising as well. A natural reading of the Agreement does not bear them out. There is no time limit attached to the advertising restrictions. The payment of profits provision is in a separate numbered paragraph

and the only connection to the advertising provision is the statement that the payments are for Sweeney and Pfeifer's agreement not to advertise. Needless to say, this does not establish a necessary relation between the period for payment and the duration of the advertising Agreement. The restriction on advertising is thus naked, not ancillary, and *per se* illegal to boot.

## 2. Availability of treble damages

That this Agreement is illegal and unenforceable is relatively clear. The more difficult question is whether these plaintiffs are entitled to treble damages. Treble damages are a potent remedy. Accordingly, the Supreme Court has placed limits on their availability under § 4 of the Clayton Act. Because two of these limits, the defense of equal responsibility and the requirement of an antitrust injury, apply to the present case, plaintiffs cannot recover on their claim for treble damages, costs, and attorneys' fees.

## A. Equal Responsibility

In *Perma Mufflers v. Int'l Parts Corp.*, a suit by Midas Muffler franchisees against their parent corporation, the Supreme Court held that the common law doctrine of *"in pari delicto,* with its complex scope, contents, and effects" did not apply on the facts of the case and was "not to be recognized as a defense to an antitrust action." 392 U.S. 134, 140, 88 S.Ct. 1981, 1985, 20 L.Ed.2d 982 (1968). Nonetheless, five justices endorsed a more narrow defense which would bar a plaintiff from recovering damages for violations for which he was substantially equally responsible. See *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 307–11, 105 S.Ct. 2622, 2627–29, 86 L.Ed.2d 215 (1985) (following *Perma Mufflers* the Court held that the same limited defense but not the general common law *in pari delicto* doctrine was available in private damage actions brought under the federal securities laws). This Circuit has accepted and endorsed the equal responsibility defense. See *Premier Electrical Construction Co. v. Miller–Davis Co.,* 422 F.2d 1132 (7th

Cir.1970); *General Leaseways v. Nat. Truck Leasing Ass'n,* 830 F.2d 716 (7th Cir.1987).

Without this bar to treble damages, an equally culpable party to an illegal agreement who defects first could not only profit from his own wrongdoing, but would be assured of doing so. The availability of treble damages would encourage rather than deter violations of the anti-trust law, by offering a potential oligopolist the option of more than covering his losses with treble damages from his cohort if their agreement to cooperate proved unprofitable. See *Perma Mufflers,* 392 U.S. at 151, 88 S.Ct. at 1991 (Marshall, J. concurring).

This appears to be exactly what happened in the present case. This was not an agreement between a franchisee and franchisor where there is a clear asymmetry in bargaining power. Both sides obtained the exclusive right to advertise in the areas in which they presently practiced. Clearly, Sweeney and Pfeifer had the upper hand to the extent that they were the senior partners in the firm and had prevailed in their state court lawsuit against Blackburn and Green. But because the court had already ordered the dissolution of the partnership, Blackburn and Green had no reason to enter the Agreement at all unless they found that on balance the terms were to their benefit. Reading the Agreement it is difficult to see what Blackburn and Green gained over the court-ordered dissolution besides the dismissal of Sweeney and Pfeifer's lawsuit and the reciprocal advertising restrictions for which they are now seeking damages.

Blackburn's and Green's claim that the terms of the Agreement were dictated by Sweeney and Pfeifer is further undermined by the 25 drafts and month of negotiations that preceded the final version. The district court found that the Agreement was "freely negotiated" and that the record was "absolutely silent as to any improper coercion" (Pl.App. 3). Plaintiffs now claim that they were coerced by the threat of disciplinary charges being filed against them. It is interesting to note that though the state court had found that Blackburn and Green had diverted partnership funds, the stipulation dismissing the state court suit with prejudice por-

trays plaintiffs as innocent of any wrongdoing. The threat of disciplinary charges after a court has found an unauthorized diversion of partnership funds is not the sort of economic coercion which should allow plaintiffs to disavow their allegedly illegal agreement. Moreover, if indeed Blackburn and Green entered the Agreement to induce Sweeney and Pfeifer to dismiss their suit with prejudice and gain the whitewash stipulation, it is difficult to see why they should be able to renege on the Agreement, avoid the impending adverse state court ruling and potential disciplinary charges and collect treble damages for their efforts.

### B. Antitrust Injury

■■■ Even if we are wrong and Blackburn and Green were not equally responsible for the illegal agreement, they cannot recover treble damages because they have not suffered an antitrust injury. To recover treble damages under § 4 of the Clayton Act a plaintiff must prove an "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487–88, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies in restraint of trade. The Act was intended to prevent harms to competition, *i.e.*, higher prices and lower output resulting from collusion among competitors. See *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins.*, 784 F.2d 1325, 1334 (7th Cir.1986); Richard Posner, Antitrust Law.

■■ As one of the two colluding competitors, Blackburn and Green did not suffer from the effects of their own collusion on competition, and therefore could not have suffered an antitrust injury. See Handler and Sacks, *The Continued Vitality of in Pari Delicto as an Antitrust Defense*, 70 Geo.L.J. 1123, 1149 (1982). They may have chafed under the terms of their perhaps ill-advised collusive Agreement, but their suffering did not result from the effects of that Agreement on competition. This distinction is a fundamental one. Section 1 of the Sherman Act prohibits collusive agreements not out of a concern for the competitors who enter them, but because of the dangers they pose to the market, *i.e.*, their potential for shifting prices and production away from competitive levels.

Plaintiffs correctly argue that a cartel participant may suffer an antitrust injury. "Losses inflicted by a cartel in retaliation for an attempt by one member to compete with the others are certainly compensable under the anti-trust laws." *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774 (7th Cir. 1994). However, the defecting member suffers an antitrust injury in that circumstance because the remaining cartel's ability to retaliate depends on its power in the market. That market power, resulting from the collusion among the remaining members, is the evil at which the antitrust laws are aimed. Therefore, because the harm suffered by a consumer forced to pay inflated prices, and the harm inflicted on an excluded competitor and onetime cohort (*e.g.* through predatory pricing) both result from the anti-competitive effect of the cartel agreement, they are both antitrust injuries.

But, this is not a case of retaliation by the remaining members of a cartel. Without Blackburn and Green, there is no remaining cartel. There is only Sweeney and Pfeifer, and they alone cannot violate § 1 of the Sherman Act much less inflict an antitrust injury on Blackburn and Green. Blackburn and Green's only injury, if they have one, results from the allegedly disadvantageous terms of their own agreement. But this is not an injury for which the antitrust laws supply a remedy, much less treble damages.

### Conclusion

Summary judgment for defendants Sweeney and Pfeifer is reversed. The case is remanded to the district court with instructions to enter summary judgment for Blackburn and Green after striking their claim for an injunction, treble damages, attorney's fees and costs. Each party shall bear its own costs of this appeal.